572 A.2d 1144

**Bernice T. KESSLER**

v.

**EQUITY MANAGEMENT, INC.**

**No. 1217, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 3, 1990.

John J. Pyne (Peter E. Derry and Pyne & Derry, P.C., on the brief), Chevy Chase, for appellant.

Barbara J. Palmer (Brassel & Baldwin, P.A., on the brief), Annapolis, for appellee.

Argued before GARRITY, BLOOM and FISCHER, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Montgomery County returned a verdict for the defendant in an action for wrongful discharge brought by Bernice T. Kessler against Equity Management, Inc.[1]

In this appeal from the judgment entered on that verdict, Ms. Kessler presents a heptad of issues, phrased as follows:

1. Did the trial judge err in refusing to instruct the jury that for an employer to fire an at-will employee for refusing to invade ·the privacy of tenants by snooping in their apartments would be against the public policy of Maryland and would constitute a wrongful discharge?

2. Did the trial judge err in refusing to instruct the jury that a request for resignation of an employee by an employer who indicates at the same time its intention to discharge the employee if he or she does not resign is a constructive discharge or termination?

3. Did the trial judge prejudicially err in:

   (A) Refusing to allow plaintiff to testify as to a statement by defendant's property manager to plaintiff shortly before she fired plaintiff, praising another employee for entering an apartment and finding and copying a tenant's private paper, namely, a last will and ·testament;  and

   (B) Refusing to allow plaintiff's attorney to cross-examine defendant's property manager regarding this incident?

4. Did the trial judge err in refusing to allow plaintiff to testify in rebuttal regarding apartments she was asked to enter by defendant's property manager which did not

---

1. The complaint also asserted a cause of action for breach of a contract of employment, but appellant voluntarily dismissed that claim at trial, electing to proceed only on the theory of wrongful discharge.  At the close of appellant's case, the court granted appellee's motion for a partial summary judgment as to appellant's claim for punitive damages.

involve tenants that management believed to have "skipped" in order to rebut the testimony of the property manager during defendant's case that the only apartments plaintiff was asked to enter were those to determine whether a tenant had "skipped"?

5. Did the trial judge make prejudicial comments during the course of the trial by way of erroneous instructions to the jury that plaintiff had the burden of showing that statements to plaintiff by defendant's property manager were done within the scope of employment and that defendant knew the statements were made and ratified them where defendant's property manager was a managing agent and the one who fired plaintiff?

6. Did the trial judge err in granting defendant's directed verdict on the issue of punitive damages?

We agree with appellant's contention that the trial judge erred in refusing to instruct the jury that firing an at-will employee for refusing to commit a trespass and invade the privacy of tenants would constitute an actionable wrongful or abusive discharge. For that error, we shall reverse the judgment and remand for a new trial. We shall also address some of the other issues raised by appellant, since they may arise again.

### Facts

In view of the nature of the principal issue presented on this appeal, we shall set forth in some detail appellant's version of the facts relating to her employment and its termination.

In 1985 appellant was hired as a part-time rental agent at White Oak Park Apartments (White Oak), an apartment complex in Montgomery County consisting of about 110 garden type apartments. Appellant and her husband had been living in one of those apartments for about 14 years. In October 1986 the White Oak complex was sold to a new owner, and appellee was engaged to manage it. Appellee also managed some nine or ten other apartment complexes in Montgomery and Prince George's counties.

Appellant was then hired by appellee as a part-time rental agent. In January 1987 appellee hired appellant on a full-time basis with the duties and title of resident manager. She was paid $100 per week and given free occupancy of her apartment, which had a rental value of $599 per month.

Appellant's duties as resident manager included showing and renting apartments; receiving rent money; preparing daily journals of receipts, including a current tabulation of rentals received, rentals due and payments of late rentals; collecting overdue rentals; sending out late notices; making bank deposits; keeping status reports of vacancies; notifying maintenance personnel of maintenance problems, including repairs, remodeling, repainting, and the like; handling tenants' complaints; receiving deliveries of supplies; handling outside contractors and repairmen; and related activities.

Katherine Chase, the property manager of White Oak, was appellant's supervisor. Mrs. Chase was also property manager at another apartment complex managed by appellee. She did not reside at White Oak but visited White Oak several times a week. Mr. Doug Margerum, appellee's president, did not maintain an office at White Oak.

Appellant's work was apparently satisfactory; she was given a cash bonus in May of 1987. In early June of that year, Mrs. Chase instructed her to enter apartments of tenants whose rent was overdue, while the tenants were not present, and to "snoop" around the apartments, looking through private papers in order to obtain information regarding tenants' places of employment, their work telephone numbers, their home telephone numbers if unlisted, wage or salary information, and other information that might be helpful in collecting the overdue rent.

Appellee testified that on the first two occasions Mrs. Chase told her to snoop, she did so, but reluctantly. She entered apartments while the tenants were absent and rummaged through their papers. Afterward, she felt bad about having done so and told Mrs. Chase she would not

snoop anymore. Mrs. Chase told her it was part of her duties. Appellant then sought and obtained a meeting with Mr. Margerum. He told her that the snooping policy was his. He said, "These people owe me money and I can do whatever I want." Mrs. Chase gave appellant further instructions regarding entering apartments.

In July 1987, appellant sustained a smoke inhalation injury while investigating a fire in the basement of one of the apartments. When she indicated she wanted to file a Worker's Compensation claim, Mrs. Chase showed great animosity and was most uncooperative in processing the claim.

On August 5, 1987, Mrs. Chase told appellant she could either resign or be fired. Appellant refused to resign, whereupon she was fired.

## I

Appellant's case was based upon a contention that she was fired by appellee for either or both of two reasons: (1) because she had filed a worker's compensation claim, or (2) because she refused to carry out instructions to make surreptitious entries into tenants' apartments and snoop into their private papers. Appellee, on the other hand, contended that appellant was fired for a variety of deficiencies as an employee.

Appellant concedes that as an at-will employee she could be terminated without cause by her employer. But, she posits, her discharge for not performing illegal or tortious acts contravenes public policy, thus constituting a wrongful discharge by her employer. Since *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), Maryland has recognized the tort of wrongful discharge. "It is defined as the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a clear mandate of public policy."

*Allen v. Bethlehem Steel Corp.*, 76 Md.App. 642, 652, 547 A.2d 1105 (1988).

█ Appellant requested a jury instruction to the effect that under the law of Maryland an employer may not fire an employee because the employee filed a worker's compensation claim for some job-related injury or for refusing to commit the tort of invasion of privacy of a third person, such as a tenant of White Oak Park Apartments, either of those reasons for discharging an employee being against public policy.

The court did properly instruct the jury that discharging an employee solely because she filed a worker's compensation claim would be a wrongful discharge. Firing an employee for that reason, the court ruled, would be contrary to a clear mandate of public policy, the Legislature having expressly forbidden employers to discharge employees solely for that reason. Md.Code Ann., art. 101, § 39A(a). *See Kern v. South Baltimore General Hospital*, 66 Md.App. 441, 504 A.2d 1154 (1986). In refusing to give the second part of the requested instruction, the court noted that appellant could point to no legislatively declared public policy. The court instructed the jury, instead, that

an employer has a legal right to discharge an employee at will with or without cause. However, the employer may not discharge an employee when the motivation for the discharge contravenes some clear mandate of public policy if in fact the employee has identified a specific expression of public policy.

We believe that it was incumbent upon the court to determine, as a matter of law, whether the firing of an employee for refusing to commit the tort of invasion of privacy, as contended by appellant, would contravene a clear mandate of public policy. And we conclude that appellant was entitled to an instruction to the effect that firing her for refusing to carry out her employer's instructions to enter tenants' apartments and snoop through their private papers, should the jury so find, would have contra-

vened a clear mandate of public policy and thus would have constituted a wrongful discharge.

In recognizing the tort of wrongful discharge for the termination of employment contrary to a clear mandate of public policy, the Court of Appeals in *Adler v. American Standard Corp., supra,* referred to the following concept of public policy described in *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 386 A.2d 1216 (1978):

> Nearly 150 years ago Lord Truro set forth what has become the classical formulation of the public policy doctrine—that to which we adhere in Maryland:
>
> Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law. *Egerton v. Earl Brownlow,* 4 H.L.Cas. 1, 196 (1853).
>
> ... But beyond this relatively indeterminate description of the doctrine, jurists to this day have been unable to fashion a truly workable definition of public policy. Not being restricted to the conventional sources of positive law (constitutions, statutes and judicial decisions), judges are frequently called upon to discern the dictates of sound social policy and human welfare based on nothing more than their own personal experience and intellectual capacity.... Inevitably, conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty. *Id.* at 605–606, 386 A.2d at 1228 (citations omitted).

291 Md. at 44–45, 432 A.2d 464.

The Court then noted that it had not confined itself to legislative enactments, prior judicial decisions, or administrative regulations when determining the public policy of this state. Nevertheless, it has always been aware "that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a

very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch." *Id.* at 45, 432 A.2d 464. The Court then quoted from the opinion written by Mr. Justice Sutherland in *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930):

> The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another. (Emphasis added [by the *Adler* Court].)

Unlike the situation where an employee is fired, contrary to statutory prohibition, for filing a worker's compensation claim (Md.Code Ann., art. 101, § 39A(a)), or for refusing to take a polygraph test (Md.Code Ann., art. 100, § 95; *see Moniodis v. Cook*, 64 Md.App. 1, 494 A.2d 212 (1985)), there is no statutory expression of public policy pertaining to discharge of employees for refusing to invade the privacy of others. There are, however, both statutory and constitutional protections against such invasions of privacy as appellant claims she was ordered to commit.

It is an elementary principle of real property law that a tenant has a right of possession of demised premises to the exclusion of the landlord. "During the term of the tenancy, unless permitted by the terms of the lease,[2] a landlord has no more right to enter premises possessed by the tenant than a stranger would have"; and "[i]t is axiomatic that one not antecedently authorized may not himself

---

2. Appellee's brief directs us to nothing in the record indicating that it had reserved, in its leases, the right to enter the demised premises without prior notice to the tenant. Any attempt to insert in the lease a right of entry without notice and permission for any purpose (except in the event of emergency) would have violated the provision of the Montgomery County Code relating to landlord-tenant relations, specifically § 29–26(q).

enter the property of a stranger, nor authorize another to do so." *Miller v. State,* 174 Md. 362, 368, 198 A. 710 (1938). Had appellant done what she was instructed to do, entering leased apartments when the tenants were absent and without notice to or permission from the tenants, she would have committed a trespass, subjecting her to civil liability for damages.

The fact that the tenants whose premises appellant was told to invade were in arrears in their rent is of no significance. If rent is past due, there are statutory remedies available to the landlord: distress (distraint), Md.Real Prop. Code Ann., §§ 8–301 through 8–332, or repossession by summary proceeding, § 8–401. Both of those remedies require judicial action in which the tenant is given due notice and an opportunity to be heard; in either of those judicial proceedings, the entry to levy on property in the demised premises or the entry to put the landlord back in possession is by a judicial officer armed with a writ. The landlord has no right to enter the premises while the tenant is still in possession. There was conflicting evidence as to whether the apartments appellant was directed to enter were known to be occupied. Mrs. Chase testified that she only directed appellant to enter apartments that she thought might have been abandoned; appellant testified that on occasion she was ordered to enter an apartment known to be still occupied. That dispute is over an immaterial issue. The purpose in entering the apartment was to rummage through the tenant's effects, and, so long as his effects remained in the demised premises, the tenant was still in possession.

In *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989), the Court of Appeals referred to a review of the "first round" cases in which the public policy exception to the terminable at-will doctrine was initially adopted in *Note, Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1931–37 (1983). The author of that Note concluded that courts have applied the public policy exception to

discharges involving three broad categories of motives, one of which is "Refusing to Commit an Unlawful Act." The Court also referred to Lopatka, *The Emerging Law of Wrongful Discharge—A Quadrennial Assessment of the Labor Law Issue of the 80's*, 40 Bus.Law 1, 6–17 (1984), in which the public policy exception cases were similarly divided into three categories.

We need not decide whether discharging an at-will employee for refusing to commit *any* act that might technically be tortious would be "contrary to a clear mandate of public policy." Specifically, it is not necessary that we decide whether firing an employee for refusing to trespass on another person's property would be so contrary to public policy as to give rise to the cause of action recognized in *Adler*. What appellant was instructed by her employer to do and what she refused to do went far beyond mere unauthorized entry into tenants' apartments. She was told that once inside the apartment she was to rummage through the tenants' personal papers and effects to gather information that might be useful to the landlord in collecting past due rent—a much more grievous wrong than a trespass *q.c.f.*

The right of privacy is a treasured right, a right that has been recognized as one protected by the United States Constitution. *See, e.g., Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in which the Supreme Court, abandoning the "trespass" doctrine of prior decisions, held that the Fourth Amendment protects people, and their right to privacy, rather than places. As Mr. Justice Stewart, writing for the Court, noted in *Katz*, other provisions of the Constitution protect personal privacy from other forms of governmental invasion. 389 U.S. at 350 n. 5, 88 S.Ct. at 510 n. 5. Earlier, in *Tehan v. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), Mr. Justice Stewart, writing for the Court, referred to "the Constitution's concern for the essential values represented by 'our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may

lead a private life." ' "  *Id.* at 416, 86 S.Ct. at 465, quoting from *United States v. Grunewald,* 233 F.2d 556, 581–82 (2nd Cir.) (Frank, J., dissenting), *rev'd,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1956).

■  A tenant does not give up his constitutionally protected right of privacy by failing to pay rent timely. Even if he is summarily evicted for failing to pay rent and his possessions are put out on the street by the sheriff, he retains a reasonable right and expectation of privacy in those effects, particularly his personal papers among them. *State v. Boone,* 284 Md. 1, 393 A.2d 1361 (1978).

■  Had appellant carried out her instructions to invade tenants' constitutionally protected rights of privacy by snooping through their private papers, she would have been subject to civil liability. As Judge Eldridge, writing for the Court of Appeals in *Widgeon v. Eastern Shore Hospital Center,* 300 Md. 520, 479 A.2d 921 (1984), explicated, violations of state or federal constitutional rights are actionable wrongs. Indeed, under the common law of England, the benefits of which are assured to the inhabitants of Maryland by Article 5 of the Maryland Declaration of Rights, where individual rights were preserved by a fundamental document such as Magna Carta or by the unwritten British constitution, a violation of those rights could be remedied by an action at law for damages.

In this case, the trial judge was called upon to declare whether an employer who fires an employee for refusing to carry out an instruction to snoop through a third person's private papers has committed an actionable wrong. He declined to rule one way or the other, in effect leaving that to the jury to decide. This appeal requires us, then, to make that determination. We find no legislative declaration of public policy on the subject, and we have been referred to no case that has heretofore addressed the precise issue. Ruling, then, for what appears to be the first time on this specific subject, we hold that firing an at-will employee for

that reason does constitute a wrongful discharge and that the trial judge erred in refusing to so instruct the jury.

Our ruling is based upon the belief that the constitutionally protected right of privacy, the right to be free of others' snooping, spying, rummaging, or searching through one's personal and private papers, is such a fundamental right that no employer may require an employee to violate it as a condition of employment. Consequently, firing an employee for refusing to commit such a wrongful act ought to be and is in contravention of a clear mandate of public policy.

## II

■ Appellant attempted to present testimony to the effect that when she returned to work following her injury Mrs. Chase told her that during her absence Mrs. Crawford, a temporary substitute, had entered a tenant's apartment, looked through the tenant's papers for information useful to appellee, and had found a will. Mrs. Chase, according to appellant's proffer, relayed that information with expressions indicative of approval for the substitute's conduct. The court sustained appellee's objection to that testimony, apparently accepting appellee's argument (1) that it was hearsay and (2) that it could not be received as an admission by the defendant without proof that Mrs. Chase was authorized to bind her employer by an admission. *See Burkowske v. Church Hospital Corporation,* 50 Md.App. 515, 439 A.2d 40 (1982), *cert. denied,* 293 Md. 331 (1982).

The court's ruling was erroneous. Hearsay is an out-of-court assertion offered in court for the truth of the matter asserted, and resting for its value upon the credibility of the out-of-court asserter. *Best v. State,* 71 Md.App. 422, 432, 526 A.2d 75, *cert. denied,* 311 Md. 20, 532 A.2d 167 (1987); *Ali v. State,* 67 Md.App. 339, 343, 507 A.2d 648 (1986). Appellant was certainly not offering the out-of-court statement of Mrs. Chase for the truth of that statement. Whether Mrs. Crawford did in fact enter an apartment, search through the tenant's effects, and find a will was of

no significance. What was significant was that Mrs. Chase said she did and said it in a manner indicating approval. The testimony was offered as a verbal act, the equivalent of an instruction, request, or suggestion from her employer: "Mrs. Crawford did these things that we have told you to do, and we are pleased; we expect you, the full-time resident manager, to do likewise." Offered for that purpose, the proffered testimony was admissible.

## III

On retrial, the issue of whether punitive damages may be awarded is likely to arise again. The trial court granted appellee's motion for judgment on that issue, dismissing appellant's claim for punitive damages. In order to recover exemplary or punitive damages in Maryland for a tort arising out of a contract, the plaintiff must show to the satisfaction of the trier of fact actual malice committed by the defendant. *American Laundry Machine Industries v. Horan,* 45 Md.App. 97, 412 A.2d 407 (1980). Actual malice has been defined in *H & R Block, Inc. v. Testerman,* 275 Md. 36, 43, 338 A.2d 48 (1975), as "performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff."

In the case at bar, there was a contract of employment between appellant and appellee. The contract was unwritten and appellee had broad rights to terminate appellant at will, but it was nonetheless a contract. The tort of wrongful discharge, if it occurred at all, arose out of that contract of employment. Therefore, in order to recover punitive damages for that tort, appellant had to prove actual malice.

In *Moniodis v. Cook, supra,* the trial court allowed a finding of actual malice where the evidence showed "Rite–Aid through its officers was well aware of the appellees' rights under the statute but terminated the appellees in utter disregard for those rights." Appellant's rights as well as the underlying reasons for her termination are much

less clear than the rights and grounds of discharge of the Rite–Aid employees in *Moniodis*. *See also Miller v. Schaeffer*, 80 Md.App. 60, 559 A.2d 813 (1989). Our examination of the evidence, viewed in the light most favorable to appellant, persuades us that appellant failed to present any evidence from which the jury could find actual malice. We do not believe that actual malice, an intention "to deliberately and willfully injure" appellant, can be inferred from the act of firing appellant for refusing to carry out instructions to snoop through tenants' private papers.

The court did not err in granting appellee's motion for judgment on the punitive damages issue.

## IV

Appellant contends that the trial judge erred in refusing to instruct the jury that a request for resignation of an employee by an employer who indicates its intention to fire the employee if she does not resign is a constructive discharge or termination. We disagree.

Certainly, the instruction is a correct statement of the law. As Judge Wilner pointed out for this Court in *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 477 A.2d 1197, *cert. denied*, 301 Md. 639, 484 A.2d 274 (1984), in order to have an actionable wrongful or abusive discharge there must, of course, be a discharge or termination of an at-will employment by the employer. Normally, an employer who resigns is not regarded as having been discharged and therefore would have no right of action for abusive discharge. But the law, discarding form for substance, recognizes the concept of "constructive discharge" and treats an involuntary resignation that was coerced by the employer as a discharge. *Id.* at 649, 477 A.2d 1197. In *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798, *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985), where employees were told they would be terminated in any event and were given an opportunity to resign instead of being fired, their resignations were held to be constructive

discharges. *See also Cumb. & Penn. R.R. Co. v. Stack,* 45 Md. 161 (1876).

It is not the function of the court to advise the jury on abstract or moot propositions of law, however. A party is entitled to an instruction that correctly states the law only if that law is applicable to some issue in the case, *i.e.,* if there is testimony in the case which supports it. *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651 (1979). In this case there was no dispute about the fact that appellant was fired. She did not resign, under coercion or otherwise. There being no factual issue in the case relating to the concept of constructive discharge, appellant was not entitled to an instruction on the law of that subject.

### V

■ Appellant testified, during her case-in-chief, that on one occasion, at least, she was told to enter and snoop around in an apartment both she and Mrs. Chase knew was still occupied. Mrs. Chase testified, however, that the only apartments appellant was asked to enter were those that were leased to tenants that the management had reason to believe had "skipped." Appellant complains that the court erred in refusing to let her present rebuttal evidence to refute Mrs. Chase's testimony on that point.

The determination of what is proper rebuttal evidence is left to the sound discretion of the trial judge, and an appellate court will not reverse on the basis of a ruling on that subject unless the court below was both manifestly wrong and the ruling was substantially injurious. *Riffey v. Tonder,* 36 Md.App. 633, 645–46, 375 A.2d 1138, *cert. denied,* 281 Md. 745 (1977).

We perceive no reversible error in that evidence ruling. In any event, on retrial appellant will have an opportunity to introduce all evidence pertaining to the issue in question during her case-in-chief.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.