659 A.2d 398

**David McINTYRE**

v.

**GUILD, INC., et al.**

**No. 1730 Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 8, 1995.

336

338

Peter N. Mann, Washington, DC, for appellant.

Henderson J. Brown, IV, Greenbelt (Wendy A. Hartmann, Eveland, Brown & Sherman, P.C., Greenbelt, and Gary H. Gerstenfeld, Columbia, on the brief), for appellees.

Argued before MOYLAN, FISCHER and DAVIS, JJ.

DAVIS, Judge.

Appellant, David McIntyre, brought suit in the Circuit Court for Prince George's County, alleging wrongful discharge (Count I) and breach of employment contract (Count II) against appellee Guild, Inc. (Guild), as well as intentional interference with contractual relations (Count III) against appellee Lt. Col. Everett Foster. Guild filed a motion to dismiss for failure to state a claim, and Lt. Col. Foster filed a motion for summary judgment. The trial court (Martin, Jr., J.) granted both motions after a hearing.

Appellant presents three questions for our review:

1. Did the trial court err when it dismissed appellant's wrongful discharge claim?

2. Did the court err when it dismissed appellant's breach of contract claim?

3. Did the court err when it granted Lt. Col. Foster's motion for summary judgment?

## FACTS

The following facts are gleaned from the pleadings and various exhibits. Appellee Guild, Inc. (Guild) is a corporation that provides its clients with "full service marketing design." Appellant David McIntyre is an experienced communications

**340**

professional. In the spring of 1993, Guild was competing for a contract with the United States National Guard for "Environmental Community Relations Support Services," including the production of several films. In the process of putting together a bid for that contract, Guild began to solicit McIntyre's assistance. By letter dated April 6, 1993, Guild informed McIntyre:

> The contract will require the special talents and expertise of people such as yourself, but, at the present time, the specific assignments have not yet been fully developed. This letter constitutes a formal request from Guild, Inc. for you to acknowledge, by signing below, your willingness to be hired as a _____ *(insert labor category)* by Guild, Inc. . . . in the event that your services, as determined by Guild, TEXCOM, the Federal Government, or any combination thereof, are needed in order for the contract to be performed properly.

The letter was signed by Eugene Orr, president of Guild. The blank specifying the "labor category" was not filled in. A second letter, also dated April 6, 1993 and signed by Orr, stated: "At this time we would like to have a firm commitment for every available position. We will need to know your availability for the first year of the contract."

> According to McIntyre, he sent Guild the following reply:

> This letter is to confirm that upon agreement of financial terms, I will accept the senior management position with Guild, Inc. I understand that this position is based upon the successful awarding of the National Guard contract to Guild Inc.

The copy of this letter included in the record is unsigned.

In May 1993, the National Guard awarded the contract to Guild. A third letter from Guild purports to confirm Guild's offer of a "full-time exempt position as Senior Management Specialist on the National Guard Bureau (NGB) contract at Guild, Inc." The document provides for compensation of $47,000 per year, and a starting date of July 6, 1993. After

describing the benefits and other terms of employment that are not pertinent here, the document states:

> Guild views the first three months of employment as a probationary period during which the employer and employee can establish a performance relationship which is mutually satisfactory and which will validate that the promises and potentials seen by each party during the application/interview process have or can be fulfilled. Hence, you may expect that during the first three months of employment, your designated supervisor will work closely with you, train you, counsel you, and comment on your performance in order to assist you in meeting the job requirements of your position to your full capacity.

Appellant signed the bottom of the document to indicate that he accepted the offer "as outline[d] above."

According to appellant's amended complaint, a dispute arose in August 1993 between appellant and Lt. Col. Everett Foster of the National Guard.[1] Appellant had made arrangements for certain video production work to be subcontracted to a company of his choosing. Lt. Col. Foster, however, requested that the work be performed by a company called Video Workshop, at a price of $10,000 to $20,000 more than the company that appellant had selected. Lt. Col. Foster was a former employee of Video Workshop, and allegedly acknowledged that it would be a "conflict of interest" for him to insist that Guild retain Video Workshop. Nonetheless, he stated that Guild's use of Video Workshop was "very important" to him.

Appellant promptly spoke to his supervisor about the situation. He informed his supervisor that Lt. Col. Foster "clearly had a conflict of interest with respect to Video Workshop, that there was no valid performance-related reason for hiring Video Workshop at such an inflated price," and that if Guild

---

1. Although Lt. Col. Foster was a major at the time the dispute arose, we refer to him by his present rank throughout. The complaint states that Lt. Col. Foster was not the National Guard's "contracting officer," but does not specify his precise relationship to the contract.

agreed to hire Video Workshop, it might not be able to justify the extra expense. Lt. Col. Foster thereafter let it be known that Video Workshop was the only video production company in which he had confidence. Lt. Col. Foster also indicated that he had previously terminated an entire project because of a "lack of confidence" in the production crew, and stated that he might have similar reservations about Guild unless it decided to use Video Workshop.

On August 27, 1993, Guild terminated McIntyre's employment.[2] Guild allegedly explained that it was necessary to fire appellant in order to placate Lt. Col. Foster, who had no confidence in appellant's ability to manage the project. When appellant attempted to defend his position regarding Guild's use of Video Workshop, he was told that "[i]f the government wants to spend more, they can spend more. This is a cost-plus contract." Prior to his termination, appellant had not received any negative comments on his performance from anyone at Guild.

As we noted above, appellant's claims were dismissed on Guild's motion to dismiss and Lt. Col. Foster's motion for summary judgment. This appeal followed.

## LEGAL ANALYSIS

When reviewing a disposition by motion to dismiss for failure to state a claim, "we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings." *Sharrow v. State Farm Mut. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492 (1986); *Baker, Watts, & Co. v. Miles & Stockbridge*, 95 Md.App. 145, 186, 620 A.2d 356 (1993). Moreover, we consider the "well-pleaded allegations" in the light

---

**2.** Guild gave appellant two weeks notice, and told him not to do any work in connection with the National Guard contract during that period. Appellant contends that he was directed to prepare false time sheets for the final two weeks, showing forty hours of work on the National Guard contract each week. Because these events took place *after* appellant's employment had been terminated, they have no bearing on his claims against appellees.

most favorable to the non-moving party. *Berman v. Karvounis,* 308 Md. 259, 264, 518 A.2d 726 (1987). Our task is to determine whether the facts alleged in appellant's complaint are legally sufficient to state a cause of action. *See Sharrow,* 306 Md. at 768–69, 511 A.2d 492; *Briscoe v. Baltimore,* 100 Md.App. 124, 128–29, 640 A.2d 226 (1994). We limit our review, however, to specific allegations of fact and the inferences deducible from them, and not "merely conclusory charges." *Parker v. The Columbia Bank,* 91 Md.App. 346, 351 n. 1, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992) (quoting *Berman,* 308 Md. at 265, 518 A.2d 726).

## I

Appellant first contends that the trial court erred when it dismissed his claim for wrongful discharge. His amended complaint states, in part, that appellant was dismissed for acting in furtherance of the public policy underlying the federal False Claims Act, 31 U.S.C. § 3729 (1988 ed.). Appellant further contends that his employment was terminated as retaliation for his exercise of "free speech," and that his termination was contrary to the public policy embodied in the First Amendment and Article 40 of the Maryland Declaration of Rights. We shall address the False Claims Act and First Amendment issues separately.

### The False Claims Act

The Court of Appeals first recognized a cause of action for wrongful discharge in *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981). Prior to *Adler,* Maryland strictly adhered to the common law rule that, absent a statutory or contractual obligation to the contrary, an employer may terminate the employment relationship at any time for any reason, or for no reason at all. *See, e.g., State Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 126, 360 A.2d 1 (1976). In *Adler,* 291 Md. at 46–47, 432 A.2d 464, the Court recognized a "narrow exception" to that rule, and held that an at-will employee who has been discharged in a manner that contravenes public policy may maintain a cause of action for abusive

or wrongful discharge against his or her former employer. *See also Ewing v. Koppers Co., Inc.,* 312 Md. 45, 49, 537 A.2d 1173 (1988) (holding that a claim for wrongful discharge may also be asserted by a contractual employee). Subsequent decisions have recognized a claim for abusive discharge only where the discharge violates a "mandate of public policy" that is clearly set forth in the constitution, a statute, or the common law. *See Leese v. Baltimore County,* 64 Md.App. 442, 468, 497 A.2d 159, *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985) ("We can conceive of no clearer 'mandate of public policy' than the rights spelled out in the United States Constitution."). *See, e.g., Ewing,* 312 Md. at 50, 537 A.2d 1173 (employee discharged for exercising statutory rights under workers' compensation statute); *Kessler v. Equity Management, Inc.,* 82 Md.App. 577, 589–90, 572 A.2d 1144 (1990) (employee discharged for refusal to invade a tenant's right to privacy). *See also Adler,* 291 Md. at 45, 432 A.2d 464 (suggesting that public policy may, on rare occasions, be derived from sources other than legislative enactments, administrative regulations, or prior judicial decisions).

It is generally not sufficient to show that the employer violated the "spirit" or "intent" underlying a particular law or constitutional provision. *See Miller v. Fairchild Industries,* 97 Md.App. 324, 336–37, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). In order to state a claim for wrongful discharge, a plaintiff ordinarily must set forth clear, specific allegations of fact tending to show that the employer either (1) violated the legal rule at issue, or (2) punished the employee for exercising some legal right. *See, e.g., Lee v. Denro, Inc.,* 91 Md.App. 822, 831–33, 605 A.2d 1017 (1992); *Ewing,* 312 Md. at 50, 537 A.2d 1173. A claim for wrongful discharge may also be asserted in cases where the employee has been discharged for refusing to violate the law, or refusing to violate the legal rights of some third party. *See Kessler,* 82 Md.App. at 590, 572 A.2d 1144.

Our decision in *Lee* underscored the fact that a claim for wrongful discharge requires more than mere conclusory alle-

gations. The plaintiff in that case was employed by a company that produced a communications system designed for use by air traffic controllers. *Lee,* 91 Md.App. at 825, 605 A.2d 1017. While participating in tests of that equipment, Lee observed that mistakes were made and that testing procedures were not properly followed. *Id.* at 826–27, 605 A.2d 1017. She was fired after she called the problem to the attention of the director of manufacturing, and voiced her concerns in the presence of the customer (the Federal Aviation Administration).

In her complaint, Lee alleged that her employer's conduct violated two criminal statutes, including a statute prohibiting "false, fictitious or fraudulent statements or misrepresentations" regarding any matter "within the jurisdiction of any . . . agency of the United States." *Id.* at 831, 605 A.2d 1017 (quoting 18 U.S.C. § 1001). After reviewing the elements of the crime, we concluded:

> Lee does not allege that Denro made any false statement, let alone a material or willful one. Nor does she allege that Denro discharged her because she refused to make a false statement. In short, the complaint does not begin to set forth the allegations necessary to demonstrate that Denro's "conduct violated § 1001."

*Id.* at 832, 605 A.2d 1017 (footnote omitted). Accepting the averments in Lee's complaint as true, we nonetheless held at 831, quoting *Adler,* 291 Md. at 44, 432 A.2d 464, that they were "too general, too conclusory, too vague and lacking in specifics to mount up to a prima facie showing."

The same may be said for the complaint at issue in the present case. In that complaint, appellant asserted that Guild acted with an intent to punish him "for acting in furtherance of the goals and interests of the False Claims Act" (the Act). The Act provides, in pertinent part, that any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent

claim for payment or approval" is liable to the United States Government. 31 U.S.C. § 3729(a).

In order to recover damages for violation of the Act, the government must establish that

(1) the person presented or caused to be presented to an agent of the United States a claim for payment;

(2) the claim was false or fraudulent;

(3) the person knew the claim was false or fraudulent; and

(4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994) (citing *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17, 23 (1977)). An action under the False Claims Act does not require an intent to deceive, but merely the knowing presentation of a claim that is "fraudulent" or simply "false." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991).[3] *See also* 31 U.S.C. § 3729(b) (defining "knowingly" as possessing actual knowledge, or acting with "deliberate ignorance" or "reckless disregard" for the truth).

In the present case, appellant's amended complaint asserts (1) that Guild failed to accept the lowest bid, (2) that in appellant's opinion, "there was no valid performance-related reason for hiring Video Workshop at such an inflated price," and (3) that "the discharge of [appellant] *enabled Guild* to present to a member of the Armed Forces a false and fraudulent claim for payment or approval" (emphasis added). Appellant has not asserted that such a claim was *actually* submitted. Assuming, arguendo, that Guild subsequently submitted a claim for the actual amount of Video Workshop's bid,

---

**3.** We note, in passing, that the government's prior knowledge of the false claim is not a valid defense. *See United States ex. rel. Hagood*, 929 F.2d at 1421 ("That the relevant government officials knew of the falsity is not in itself a defense."). Thus, allegations that Lt. Col. Foster was fully aware of any claim submitted would not preclude an action under the False Claims Act.

we cannot agree that such a claim would violate the False Claims Act. Appellant simply does not explain what aspect of the claim would be "false" or "fraudulent," nor does he contend that Guild was *required* by law or contract to accept the lowest bid.[4] We think it obvious that a claim may be "wasteful" without being either false or fraudulent.

 Whether a claim submitted by Guild was false or fraudulent could be tested only after a claim was actually submitted. To conclude that Guild *might* submit such a claim, based on the bid from Video Workshop, would be nothing more than sheer speculation. As we explained in *Lee,* 91 Md.App. at 831, 605 A.2d 1017, such conclusory allegations cannot support a claim for wrongful discharge.

### The First Amendment

 In his amended complaint, appellant also asserts that Guild's conduct was intended to prevent him from exercising his constitutional right to free speech, in contravention of the public policy "embodied within the First Amendment and the Maryland Declaration of Rights." As a threshold matter, we must consider whether Guild's discharge of appellant constituted government action. Under the "state action" doctrine,[5] "[c]onstitutional guarantees have been uniformly interpreted to restrain and restrict only the conduct of the *government vis-a-vis* private individuals; in the absence of state action there can be no violation of constitutional rights." *Miller v. Fairchild Industries,* 97 Md.App. 324, 336, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). *See also Bleich v.*

---

4. In fact, appellant's complaint suggests the opposite. As we noted above, appellant was allegedly told that "[i]f the government wants to spend more, they can spend more. This is a cost-plus contract." Moreover, appellant told his supervisor that "if Guild agreed to retain Video Workshop it might later find itself unable to justify the reasons it did not accept a more reasonable bid from an acceptable bidder." The obvious inference from those averments is that Guild's contract with the National Guard did not require it to accept the lowest bid.

5. Hereafter, we use the term "state action" broadly to include action by any level of government, including a branch of the federal government.

*Florence Crittenton Serv.*, 98 Md.App. 123, 135, 632 A.2d 463 (1993). Where government action is not involved, an employee who has been discharged or disciplined may not assert a claim for violation of the right to speak freely. *Miller,* 97 Md.App. at 336–337, 629 A.2d 1293.

In *Burning Tree Club, Inc. v. Bainum,* 305 Md. 53, 501 A.2d 817 (1985), the Court of Appeals discussed the state action doctrine at length. Where the impetus for the action at issue is private, the Court explained, "the state must have significantly involved itself with the invidious discrimination before the doctrine may be invoked." *Id.* at 74, 501 A.2d 817. Thus, the state action doctrine may not be invoked where the private actor merely received a public benefit, or where the government has approved or acquiesced in the initiatives of a private party. *Id.* at 74–75, 501 A.2d 817 (discussing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Where the conduct at issue involves a private actor, the state action doctrine may not be invoked unless the plaintiff can establish a "sufficiently close nexus" between the government and the challenged action, so that the action of the private party may fairly be treated as that of the government itself. *Burning Tree Club,* 305 Md. at 75, 501 A.2d 817 (citing *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785). In other words, we must consider whether the alleged conduct is "fairly attributable" to the federal government. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). In *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785, the Supreme Court explained:

> [A]lthough the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has *exercised coercive power or has provided such significant encouragement, either overt or covert,* that the choice must in law be deemed to be that of the State.

(emphasis added). *See also Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 166, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 456, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107,* 407 U.S. at 173, 92 S.Ct. at 1971. When the government has "commanded" or "compelled" a particular result, it has become involved with that result "to a significant extent," and the state action requirement has been met. *Adickes v. Kress & Co.,* 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970) (quoting *Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963)).

■ In his amended complaint, appellant asserts that Guild terminated his employment because Lt. Col. Foster wanted him discharged, and because Foster indirectly threatened to cancel the entire project. For the purpose of our review, we must accept the truth of those averments. Under appropriate circumstances, we think the threat of cancelling a government contract may be sufficiently coercive to satisfy the government action requirement. Accordingly, we conclude that appellant's claim for wrongful discharge in violation of his First Amendment rights could not be dismissed on the ground that government action was not involved.

We stress that we have resolved this threshold question on Guild's motion to dismiss. We do not conclude that Guild's discharge of appellant constituted government action. Whether Lt. Col. Foster's conduct was sufficiently coercive to meet the government action requirement could only be determined after more extensive development of the facts. For the purpose of further analysis here, we shall assume, without deciding, that the government action requirement has been met, and that appellant may be considered to be the equivalent of a "public employee" for the purpose of his wrongful discharge claim.

■ A public employee who claims to have been discharged or disciplined for the exercise of First Amendment rights must establish two elements to prevail on the claim: (1) that the conduct at issue was protected speech; and (2) that

the speech was a "substantial" or "motivating" factor in the employer's adverse employment action. *See Mt. Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *O'Leary v. Shipley*, 313 Md. 189, 201, 545 A.2d 17 (1988). If the plaintiff carries this burden, the employer must be accorded an opportunity to show, by a preponderance of the evidence, that the employee would have been discharged regardless of the conduct at issue. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *O'Leary*, 313 Md. at 201, 545 A.2d 17.

With regard to the first hurdle, we must consider whether appellant's comments to his supervisor may be "fairly characterized" as speech "on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). When a public employee is discharged for speaking on matters of personal or private interest, "absent the most unusual circumstances," a court "is not the appropriate forum" for review of the employer's decision. *Id.* at 147, 103 S.Ct. at 1690. Whether the speech is on a matter of public concern is a question of law for the court, to be determined "by the content, form, and context of a given statement." *Connick*, 461 U.S. at 147–48 & n. 7, 103 S.Ct. at 1690 & n. 7; *See also Zamboni v. Stamler*, 847 F.2d 73, 77 (3rd Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). To hold that certain speech by a public employee does not relate to matters of public concern is not to say that such speech is entirely beyond the protection of the First Amendment. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Instead, it merely indicates that not all speech by a public employee can provide the basis for a constitutional or wrongful discharge claim. *Id.*

Although the issue has been litigated frequently, federal courts have yet to craft a bright-line rule for distinguishing speech on matters of public concern from speech on matters of personal or private interest. The cases, however, do provide certain signposts. In *Zamboni*, 847 F.2d at 77–78, for example, a detective employed by a county prosecutor's office

alleged that various actions were taken as retaliation for his opposition to the prosecutor's reorganization plan. The speech at issue involved allegations that the plan unlawfully circumvented civil service statutes. After noting that the prosecutor was the county's highest-ranking law enforcement official, the Third Circuit concluded that Zamboni's speech was a matter of public concern. *Id.* at 77. *See also Gillette v. Delmore*, 886 F.2d 1194, 1197–98 (9th Cir.1989) (allegations that police used excessive force while taking a person suspected of suffering from drug overdose to a hospital against his will); *Rankin v. McPherson*, 483 U.S. 378, 384–87, 107 S.Ct. 2891, 2896–98, 97 L.Ed.2d 315 (1987) (clerk in constable's office fired for vehement expression of disagreement with presidential policy).

Where the speech at issue deals only with internal agency grievances or procedures, however, the Supreme Court has squarely held that the speech does not involve matters of public concern. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. In *Connick*, for example, an assistant district attorney distributed a questionnaire to other employees. Among other things, the survey asked about office transfer policy, employee morale, and the level of confidence in supervisors. The questionnaire also asked whether employees "ever feel pressured to work in political campaigns on behalf of office supported candidates." The Court concluded that this last question was a matter of public concern, and that the remaining questions involved "internal office affairs." *Id.* at 148–49, 103 S.Ct. at 1690–91. *See also Mings v. Dept. of Justice*, 813 F.2d 384, 388 (Fed.Cir.1987) (criticism of a form used by the Immigration and Naturalization Service); *Barnes v. Small*, 840 F.2d 972, 982–83 (D.C.Cir.1988) (letters regarding the misbehavior of other employees in the office). Personnel issues and purely personal disputes are also not matters of public concern. *See, e.g, Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 781 (2nd Cir.), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991) (complaints about hospital residency program were personal because the speaker's primary aim was "to protect her own reputation and individual development as

a doctor"); *Hawkins v. Public Safety Dept.*, 325 Md. 621, 632–33, 602 A.2d 712 (1992) (statement that "Hitler should have gotten rid of all you Jews" was an expression of anger rather than an attempt to stimulate a dialogue on the Holocaust).

Although some federal decisions have concluded that allegations of waste and inefficiency are matters of public concern, courts have reached that conclusion *only* in cases where the workplace itself was a public institution or government agency. *See, e.g., Schalk v. Gallemore*, 906 F.2d 491, 495–96 (10th Cir.1990) (allegations of waste and inefficiency at a municipally-owned hospital); *Czurlanis v. Albanese*, 721 F.2d 98, 104 (3rd Cir.1983) (allegations of waste, inefficiency and possible fraud by county government). Other federal courts have held that conclusory allegations of waste and inefficiency are not sufficient to transform an internal agency dispute into a matter of public concern. In *Murray v. Gardner*, 741 F.2d 434 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985), for example, an FBI agent was discharged after he criticized a plan to furlough one-third of the agents in the Washington, D.C. field office. Under the plan, agents would be furloughed at random, without regard to training or seniority. Murray asserted that his comments were a matter of public concern because the furlough plan involved the disposition of public funds and the quality of the agency's work force. The D.C. Circuit, however, concluded that the furlough plan "was purely a labor relations matter." *Id.* at 438. The court noted that, if mere allegations of waste were deemed to be sufficient, *Connick*'s distinction between matters of public concern and internal agency procedures "would stand for nothing." *Id.*

The requirement that the speech at issue involve matters of public concern "reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143, 103 S.Ct. at 1688. As the Supreme Court recently explained in *Waters v. Churchill*, —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), the government's power to

suppress certain speech by employees arises from the nature of the government's mission as employer:

> The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for *the very purpose of effectively achieving its goals,* such restrictions may well be appropriate.

—— U.S. at ——, 114 S.Ct. at 1888 (emphasis added).

In a broad sense, everything that takes place in the performance of a government contract is of concern to the public, since all government contractors carry out programs at public mandate and public expense. In *Connick,* however, the Supreme Court specifically rejected this expansive line of reasoning:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. *See also Barnes,* 840 F.2d at 983.

 The concerns expressed in *Connick* and *Waters* carry even greater weight when the office at issue is not a government office, but rather the private office of a government contractor. Accordingly, we hold that speech by employees of a government contractor, with regard to performance of the contract, is generally not a matter of public concern, unless that speech involves clear, specific allegations that (1) the contractor has breached the contract, or (2) the contract is being performed in violation of federal or state law. To hold otherwise would be to create the very situation that *Connick* and *Waters* seek to avoid.

 In his amended complaint, appellant asserts:

12. ... McIntyre spoke with Alan Harris, a Vide [sic] President of Guild. McIntyre noted that Col. Foster clearly had a conflict of interest with respect to Video Workshop, that there was no valid performance-related reason for hiring Video Workshop at such an inflated price, and that if Guild agreed to retain Video Workshop it might later find itself unable to justify the reasons it did not accept a more reasonable bid.

We think it obvious that appellant's complaint falls short of the standard we set here. In the absence of allegations that Lt. Col. Foster's conduct violated some law or other government mandate, appellant's assertion that Lt. Col. Foster had a "conflict of interest" is both vague and conclusory. The same is true for appellant's assertion that Video Workshop's price was "inflated." Whether Guild could "justify" the extra expense is simply not a matter of public concern. At best, appellant has merely alleged that Guild's performance of the contract was "wasteful." As in *Murray*, mere allegations of waste will not be sufficient.

The allegations in appellant's complaint are "too general, too conclusory, too vague and lacking in specifics to amount up to a prima facie showing." *Adler*, 291 Md. at 44, 432 A.2d 464. Because appellant failed to state a cause of action for wrongful discharge on either of the two grounds asserted, the trial court did not err when it granted Guild's motion to dismiss that count.

## II

Appellant next contends that the trial court erred when it dismissed his breach of contract claim against Guild.[6] According to appellant, he entered into an employment agreement with Guild "which both parties understood was to continue in effect until the National Guard contract was completed, and in

---

6. MD.RULE 2–322(c) provides, in part, that a motion to dismiss shall be treated as one for summary judgment where "matters outside the pleading are presented to and not excluded by the court...." In ruling

no event was the employment contract to continue for less than one year." In his view, that contract was breached when his employment was terminated, without cause, seven weeks after that employment began.

 The cardinal rule in the construction of contracts is that effect must be given to the intent of the parties, unless that intent is inconsistent with some established principle of law. *Kasten Constr. Co. v. Rod Enterprises*, 268 Md. 318, 328–29, 301 A.2d 12 (1973). Construction of a contract is initially a matter of law for the court. *Suburban Hosp. v. Dwiggins*, 324 Md. 294, 306, 596 A.2d 1069 (1991). Where the language of the contract is plain and unambiguous, there is no room for construction, and we "must presume that the parties meant what they expressed." *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261–62, 492 A.2d 1306 (1985). Under those circumstances, a court may not consider extrinsic evidence of the parties' intent. Rather, we confine our review to the language itself, and we consider what a reasonable person in the position of the parties would have thought the contract meant. *Id.; Chesapeake Isle, Inc. v. Rolling Hills Dev. Co.*, 248 Md. 449, 453, 237 A.2d 1 (1968).

Appellant contends that an employment contract was formed by two letters sent from Guild to appellant, one letter sent in reply, and a final document prepared by Guild and signed by appellant. A form letter dated April 6, 1993, states, in part:

> This letter constitutes a formal request from Guild, Inc. for you to acknowledge, by signing below, your willingness to be hired. . . .

A second letter, also dated April 6, states:

> . . . At this time we would like *to have a firm commitment* for every available position.

---

on Guild's motion, the trial court considered four letters attached to appellant's complaint. Pursuant to MD.RULE 2–303(d), "[a] copy of any written instrument that is an exhibit to a pleading is a part thereof for all purposes." Consequently, the letters are not "matters outside the pleading," and Rule 2–322(c) is inapplicable. *See Parker*, 91 Md.App. at 351 n. 1, 604 A.2d 521.

*We will need to know* your availability for the first year of the contract.

We look forward to receiving your response and we also look forward to having you as an important member of the Guild/TEXCOM team.

(Emphasis added). The plain and unambiguous meaning of the first two letters may be summarized as follows. First, Guild wishes to have a "firm commitment" *from appellant,* indicating his willingness to be hired. Second, Guild needs to "know" his availability for the first year of the contract. The third letter, from appellant to Guild, merely indicates appellant's willingness to be hired, "upon agreement of financial terms." Appellant's letter to Guild does not discuss his availability for the first year of the National Guard contract.

In Maryland, an employment contract of indefinite duration is considered employment "at will," and the relationship may be terminated without cause by either party at any time. *Haselrig v. Public Storage, Inc.,* 86 Md.App. 116, 122, 585 A.2d 294 (1991); *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 338, 517 A.2d 786 (1986); *Adler,* 291 Md. at 35, 432 A.2d 464. The letters at issue here are unambiguous, and there is nothing in the text of those letters that reasonably could be construed as a commitment to employ appellant for a specific period of time. A request for an indefinite commitment *from appellant* cannot be construed as a fixed commitment *by Guild.* A mere inquiry about appellant's "availability" for the first year of the contract does not constitute a commitment for a one-year term of employment.

Appellant further contends that the existence of a one-year contract is supported by the final letter. The letter states that appellant's salary will be "$47,000 per annum," that appellant will earn "[t]en paid holidays per year," that sick leave will total "6 days in a 12 month period," and that "annual leave" will be earned at a rate of 3.08 hours per pay period, "not to exceed 10 days per year." Because the wages and benefits are stated on a "per annum" or "per year" basis, appellant contends that the letter clearly contemplates a com-

mitment to employ appellant for a minimum of one year. We do not agree. "It is well settled that a hiring at so much a week, a month *or year,* no time being specified, does not, in itself, make more than an indefinite hiring." *Gill v. Computer Equipment Corp.,* 266 Md. 170, 179, 292 A.2d 54 (1972). *See also McCullough Iron Co. v. Carpenter,* 67 Md. 554, 11 A. 176 (1887); *Board of Trustees v. Fineran,* 75 Md.App. 289, 541 A.2d 170 (1988).

In the present case, there is nothing in the letters at issue indicating a firm commitment to employ appellant for a specific period of time. The absence of such a commitment is the essence of at-will employment. Moreover, Guild's formal offer of employment expressly provides for a three-month period of probation, during which employer and employee "can establish a performance relationship which is *mutually satisfactory....*" (emphasis added).[7] As we noted earlier, appellant's employment was terminated during this probationary period.

Even when appellant's complaint is read in the light most favorable to appellant, the plain and unambiguous meaning of the language employed cannot be read as anything other than an at-will employment relationship. Consequently, Guild's discharge of appellant did not constitute a breach of contract, and Guild was entitled to judgment as a matter of law. The trial court did not err when it dismissed appellant's breach of contract claim.

### III

Finally, appellant contends that the trial court erred in granting Lt. Col. Foster's motion for summary judgment on appellant's claim for tortious interference with contractual

---

7. By definition, a "probationary" period is a period of proof, trial, or test. BLACK'S LAW DICTIONARY 1202 (6th ed. 1990). When used in reference to the initial period of employment, an employee "must prove or show that he [or she] is capable of performing the required duties" of the position before he or she will be regarded as permanently employed. *Id.*

relations. A motion for summary judgment may not be granted unless there is no genuine question of material fact and the moving party is entitled to judgment as a matter of law. *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–44, 603 A.2d 1357 (1992). Our task on appeal is to determine whether the trial court's ruling was legally correct.

Appellant argues that there was a dispute of material fact regarding the meaning of the agreement between the parties, particularly with regard to the probationary period. We disagree. By definition, a claim for tortious interference with contract requires both (1) a contract between the plaintiff and a third party, and (2) a breach of that contract. *See Fraidin v. Weitzman,* 93 Md.App. 168, 189, 611 A.2d 1046 (1992), *cert. denied,* 329 Md. 109, 617 A.2d 1055 (1993); *Fowler v. Printers II, Inc.,* 89 Md.App. 448, 466, 598 A.2d 794 (1991), *cert. denied,* 325 Md. 619, 602 A.2d 710 (1992). Because there was no breach of contract in the present case, Lt. Col. Foster was entitled to judgment as a matter of law. The trial court did not err in granting the motion.

## IV

We deprecate what appears, from fairly supportable allegations, to be unconscionable waste in the performance of government contracts. Although our legal analysis compels an affirmance of the trial court's decision to grant Lt. Col. Foster's motion for summary judgment, we do not find the conduct alleged in appellant's complaint in keeping with the trust reposed in those charged with expending public funds. We note that the only claim asserted against Lt. Col. Foster below was a claim for intentional interference with contractual relations. Neither appellant's amended complaint nor his argument to the trial court attempted to assert a claim for wrongful interference with economic relations. *See Alexander & Alexander v. B. Dixon Evander & Assoc.,* 336 Md. 635, 650–52, 650 A.2d 260 (1994) (discussing the elements of such a claim); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 68–70,

485 A.2d 663 (1984) (noting that a claim may be asserted for "maliciously interfering" with another's right to pursue his or her occupation).

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**