45 A.3d 180

**Nancy S. FORSTER**

v.

**STATE of Maryland, OFFICE OF the PUBLIC DEFENDER.**

**No. 92, Sept. Term, 2011.**

Court of Appeals of Maryland.

May 22, 2012.

566

568

Andrew M. Dansicker (Law Office of Andrew M. Dansicker, LLC, Hunt Valley, MD), on brief, for appellant.

Adam D. Snyder, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, DALE R. CATHELL (Retired, Specially Assigned), JJ.

HARRELL, J.

Appellant, Nancy Forster, challenges her termination from the position of State Public Defender. A year-long disagreement between Forster and the Board of Trustees (the Board) of the Office of Public Defender ("the Office") (collectively referred to as "the State") over operation of the Office culminated penultimately in a letter from the Board to Forster demanding a suite of management and personnel changes in the Office, accompanied with a warning that, if the changes were not implemented by a date certain, Forster would be terminated. Forster refused to acquiesce to the Board's demands, contending that the Board lacked the authority to issue such edicts, their implementation would harm indigent clients, cost more money than would be saved, and would violate provisions of the Public Defender Act. True to its threat, the Board terminated Forster. In response, Forster filed a wrongful discharge action against Appellee, the State of Maryland, Office of the Public Defender, in the Circuit Court for Baltimore City. The Circuit Court, on the State's motion, dismissed Forster's complaint for failure to state a claim upon which relief may be granted, one of the two grounds advanced by the State in its motion. The Court did not reach the merits of the State's other assertion that Forster failed to exhaust her available administrative remedies under the State Personnel and Pensions Article.

Forster maintains before us that the Circuit Court granted erroneously the State's motion to dismiss because, under our jurisprudence regarding wrongful discharge, she pleaded properly the elements of that cause of action, including that the Board's demands of her for action were ultra vires and illegal. We do not reach, however, the merits of this claim. As a threshold matter, we conclude that Forster failed to exhaust the available and primary administrative remedy provided to at-will, executive service State employees under Ma-

ryland Code (1994, 2009 Repl.Vol.), State Personnel & Pensions Article, § 11–305, even though she was not given written notice by the Board of the availability of that avenue of appeal. By parity of reasoning with our opinion in *Smack v. Department of Health and Mental Hygiene,* 378 Md. 298, 835 A.2d 1175 (2003), and the rule of statutory construction that when two statutory provisions appear to conflict, that the more specific statute serves as an exception to the more general one, we conclude that § 11–305 applies to a termination of an at-will State employee, whether for misconduct or for no reason at all. Section 11–106 applies to at-will State employee misconduct where the disciplinary action taken is other than termination. Because § 11–305 does not require the appointing authority to provide notice of the available administrative appeal, and Forster failed to appeal administratively her termination, we conclude, as a matter of law, that Forster's complaint was barred by the doctrine of administrative exhaustion.

## I. FACTUAL AND LEGAL BACKGROUND [1]

On 21 August 2009, Forster was terminated as Maryland's State Public Defender. Forster served as the State Public Defender for five years. She was employed by the Office of the Public Defender for twenty-five years in sum. The General Assembly established the Office, a semi-autonomous agency within the Executive Branch of State government, in 1971. *See* 1971 Md. Laws 209, § 1; Maryland Code (1971), Art. 27A, § 3(a) (the "Public Defender Act"). The stated policy of the Public Defender Act is to

(1) provide for the realization of the constitutional guarantees of counsel in the representation of indigent individuals, including related necessary services and facilities, in criminal and juvenile proceedings in the State; (2) assure the

---

**1.** Because this matter reaches us in the procedural posture of the grant of a motion to dismiss in the Circuit Court, we accept the well-pleaded specific facts alleged by Forster in her complaint (and any reasonable inference drawable therefrom), which, in any event, are undisputed by the State.

effective assistance and continuity of counsel to indigent accused individuals taken into custody and indigent individuals in criminal and juvenile proceedings before the courts of the State; and (3) authorize the Office of the Public Defender to administer and assure enforcement of this title. Md.Code (2001, 2008 Repl.Vol.), Crim. Proc. Art., § 16–201. The State Public Defender is the executive head of the Office, and is appointed by, and serves at the pleasure of, the Board of Trustees. Crim. Proc. Art., § 16–203(a). The primary duty of the State Public Defender is to "provide representation for indigent individuals." Crim. Proc. Art., § 16–207(a).

The State Public Defender is empowered to appoint a Deputy Public Defender, District Public Defenders, and other personnel to assist him or her in performing the duties of the Office. Crim. Proc. Art., § 16–203(c), (e). The State Public Defender must maintain the Office within its appropriation in the State budget. Crim. Proc. Art., § 16–203(g). Additional duties of the State Public Defender include: general responsibility for the operation of the Office; coordination with "professional groups about the causes of criminal conduct and the development of effective means to" reduce crime and rehabilitate those charged and convicted of crimes; and adoption of regulations and programs to carry out the purpose of the Public Defender Act. Crim. Proc. Art., § 16–207. Panel attorneys (attorneys in private practice appointed to represent certain, select indigent individuals) are supervised by the State Public Defender. Crim. Proc. Art., § 16–208(a). Each year, the State Public Defender must submit a report to the Board, the Governor, and the General Assembly providing data regarding the projected needs of the Office, the number and types of cases handled, the disposition of its cases, and recommendations for statutory changes. Crim. Proc. Art., § 16–401.

The Board is comprised of three members appointed by the governor. Crim. Proc. Art., § 16–301(b). The duties of the Board are to "(1) study and observe the operation of the Office; (2) coordinate the activities of the regional advisory boards; and (3) advise the Public Defender on panels of

attorneys, fees, and other matters about the operation of the public defender system." Crim. Proc. Art., § 16–302. In addition to appointing the State Public Defender, the Board may exercise veto power over the State Public Defender's appointment of the Deputy Public Defender and the District Public Defenders. Crim. Proc. Art., § 16–203(b). Two members of the Board constitute a quorum for taking action. Crim. Proc. Art., § 16–301(f). In 2008, Governor Martin O'Malley re-appointed T. Wray McCurdy (a prior Chair of the Board) to a three-year term as the Chair, re-appointed Margaret Mead to a three-year term, and appointed Theresa Moore to a three-year term.

Forster was appointed to the position of State Public Defender in 2004. For a year or so preceding her termination in August 2009, Forster and the Board engaged in a dispute over management of the Office. The dispute may be traced most clearly to 10 July 2008, when the freshly re-appointed/appointed Board notified Forster that they wanted to meet and discuss issues, including "[t]he status and role of the Juvenile Defenders program" and "upper level management positions" at the Office. The Board noted concerns, during a meeting on 5 August 2008 attended by Forster, specifically about the incumbent Deputy Public Defender and the District Eight Public Defender.

In the fall of 2008, as she foresaw pressing against the limits of the Office's budget appropriation, Forster wrote a letter to the Chief Judge of the Court of Appeals alerting him that the Office would cease, after its funds were projected to become depleted in April 2009, referring to panel attorneys cases where the Office had a conflict of interest with existing representation of an indigent defendant; thereafter, judges would have to appoint private attorneys to handle such cases, paying them as best as they could (if at all). The Department of Budget and Management requested that Forster reduce the fiscal year 2010 budget by $3 million and, on 3 October 2008, Forster ceased paneling cases to private attorneys in all cases, except juvenile matters.

On 8 October 2008, Forster met with the Board to explain her budgetary and operations actions. The Board approved the actions. The Chair indicated he would speak to the Governor about getting additional funds for the Office. No additional funds materialized, however. On 23 December 2008, Chair McCurdy emailed Forster requesting a line-by-line budget analysis for the next Board meeting. The Board met with Forster and the Office's Chief Financial Officer ("CFO") on 7 January 2009 to discuss budget issues. At the meeting, the Board questioned the effectiveness of the Office's Juvenile Protection Division ("JPD"). Moreover, the Board expressed a view that private panel attorneys should be used in Child in Need of Assistance ("CINA") cases, rather than Office staff attorneys. The Director of the JPD, in testimony, defended the JPD's effectiveness at the next Board meeting on 11 February 2009. In response to a Board request at the meeting, Forster emailed the Board an outline of fiscal year 2008 salary information for all Office attorneys and the JPD staff.

At the next Board meeting on 11 March 2009, Board members McCurdy and Meade pressed further for private panel attorneys in CINA cases and requested that the JPD and Capital Defense Division be disbanded. McCurdy requested that Forster, in her name, send to all Office employees an email that he authored. The draft email stated, in relevant part, that "[t]he Board's goal is to assist the attorneys and staff to better streamline office procedures [and] to make [the Office] more efficient ... it is imperative to ... eliminate redundancy within the agency." The email stated further that "[t]he Board requests input from you as to what programs could be eliminated or merged into other existing programs," and encouraged the staff to speak directly with the Board and offered that their "communication with the Board [would] be held in strict confidence and ... without repercussion." Forster told the Board that sending such an email would undermine her authority and invite complaints from disgruntled employees. Nonetheless, she offered to attempt to re-write the draft email in a way such that its content would be

acceptable to her. She withdrew later that offer, however. She informed the Board further that she would not implement the requested changes to the Office because to do so, in her estimation, would increase costs, harm indigent clients, and violate the Public Defender Act.

At the next Board meeting, on 8 April 2009, the Office's CFO provided budget analyses for the preceding four years and answered Chair McCurdy's questions as to "which budget items over the past four fiscal years have run deficits and by how much each year." The Board notified Forster that the May meeting was canceled. No meeting was held in June.

On 2 July 2009, the Board sent a letter to Forster informing her that it was dissatisfied with her performance as the State Public Defender and her failure to make "progress toward reorganization of the OPD operations." The letter stated that the Board would terminate Forster if she did not make the following changes within the ensuing 60 days:

a. Disband the Capital Defense Division and disperse the clerical staff and personnel into the District Public Defender offices;

b. Disband the Juvenile Defender Division and disperse the clerical staff and attorneys into District Public Defender offices;

c. Close Northwest Community Defenders operations and merge them into the traditional district operations;

d. Prepare an annual report pursuant to Criminal Procedure Article, § 16–401 that breaks down by district the information required by the Annual Report;

e. Begin paneling CINA representation in no less than two districts, reassigning CINA attorneys to district operations and administration of CINA paneling operations;

f. Reorganize and justify which, if any, social workers are necessary;

g. Rehire law clerks as needed; and

h. Remove [the incumbent] District Eight District Public Defender.

One Board member, Moore, did not concur with the conclusions in the letter and expressed her disagreement directly to the Governor.

On 13 July 2009, Forster wrote a letter to the Governor asking for a meeting in light of what she described as the "Board's ultra vires demands" that would require her to "violate the law." Forster sent a letter to the Board on 16 July 2009 contending that the Board's orders, if executed, were unlawful because they violated the rights of merit-system State employees, demoted State employees without basis, contravened a State hiring freeze, and would cost more than they would save. In her letter, Forster told also the Board effectively that "you are not the boss of me," e.g., it did not have the legal authority "to order me, as you do in your letter, to demote, fire and hire various personnel, or, in fact, to order me to do anything at all." On 29 July 2009, Forster met with the Governor and his staff about her concerns. On 11 August 2009, Forster emailed the Board inquiring whether there would be a meeting that month. Chair McCurdy responded "no."

On 20 August 2009, the Board met with its legal advisor from the Office of the State Attorney General concerning Forster's position. The Board voted, two-to-one, to terminate Forster. Later that day, the Board appointed an Acting Public Defender. The next morning, Forster was notified, in a hand-delivered letter, that she was terminated, effective immediately.[2] Forster did not pursue an administrative appeal of her termination. Instead, on 27 January 2010, she filed a claim with the State Treasurer, under the Maryland Tort Claims Act ("MTCA"). Md.Code (1984, 2009 Repl.Vol.),

---

**2.** Although not relevant to our decision, we note that, apparently as a result of the public controversy generated by the Board's firing of Forster, the General Assembly enacted amendments to the Public Defender Act changing the composition of the Board from three to 13 members and restricting the removal of the State Public Defender for misconduct, persistent failure to perform duties, or conduct prejudicial to the administration of justice. Maryland Code (2001, 2008 Repl.Vol., 2011 Supp.), Crim. Proc. Art., §§ 16–203, 16–301.

State Gov't Art., § 12–107. On the MTCA claim form, Forster indicated that she was terminated "for refusing to obey a negligent, unlawful, and *ultra vires* order from the Board to violate numerous statutory obligations." Forster sought four million dollars in damages.

On 16 August 2010, Forster filed a complaint against the State in the Circuit Court for Baltimore City advancing one count of wrongful discharge. The complaint alleged that the Board was authorized by statute only to "study and observe the operation of the Office" and to advise; therefore, the Board's demand of specific actions to be taken by Forster was ultra vires, required Forster to violate State law (the Public Defender Act and the State Personnel and Pensions Article), and was contrary to Maryland's public policy. She asserted that her refusal to comply with the Board's unlawful orders rendered her termination wrongful.

On 15 October 2010, the State moved, in writing, to dismiss the complaint. The State's motion argued that Forster's complaint was barred because she failed to exhaust the available administrative remedies under Title 11, Subtitle 3 of the State Personnel and Pensions Article, before seeking recourse in court. Alternatively, the State contended that Forster's complaint failed to state a viable claim for the tort of wrongful discharge because, as an at-will employee who could be terminated at any time, she served at the pleasure of the Board. Assuming the truth of Forster's allegations for the sake of argument, the State argued that her complaint failed to plead the element of wrongful discharge that requires that the termination violate a clear mandate of public policy.[3] After receiving respective rejoinders from the parties, the Circuit Court, without a hearing (none was requested), granted, on 25 February 2011, the State's motion to dismiss. A memorandum opinion memorialized the reason for the court's ruling.

---

**3.** The State argued also that Forster failed to comply with the service requirements of the MTCA. Neither party briefed or argued this ground before us.

The Circuit Court's opinion addressed the alleged public policy violations stemming from the Board's ultimatum to Forster. The court accepted the truth of Forster's well-pleaded facts and allegations in her complaint, and reasonable inferences drawn from them. Quoting from *McIntyre v. Guild*, 105 Md.App. 332, 344, 659 A.2d 398, 404 (1995), the opinion stated that Forster needed to assert

clear, specific allegations of fact tending to show that the employer either (1) violated the legal rule at issue, or (2) punished the employee for exercising some legal right. . . . A claim for wrongful discharge may also be asserted in cases where the employee has been discharged for refusing to violate the law, or refusing to violate the legal rights of some third party.

Characterizing the dispute between Forster and the Board as "passionate disagreements about the conduct of Office operations between an at-will executive employee and members of her Board," the Circuit Court concluded that there was nothing in the complaint that reflected "unlawful or particularly reprehensible conduct of the Board." Observing that the primary responsibility of the State Public Defender is to provide representation to indigent defendants, the opinion noted that Forster did not allege that the "Board instructed or required her, or anyone else with the Office, not to provide representation of indigent individuals." The opinion concluded that Forster's "allegations do not raise even the spectre of a violation of law such as denying legal representation to any individual qualified for [the Office's] services." Alluding again to *McIntyre*, 105 Md.App. at 345, 659 A.2d at 404, as well as *Lee v. Denro, Inc.*, 91 Md.App. 822, 832, 605 A.2d 1017, 1022 (1992), the Circuit Court resolved that "[s]uch differences in opinion, between an executive and members of a board to which the executive answers, without allegations of actual statutory breaches, are too general, too vague, too conclusory as to constitute a prima facie claim of wrongful discharge." In a footnote, the Circuit Court said it "need not reach and does not address" the State's administrative remedy exhaustion ground for dismissal.

On 17 March 2011, Forster filed timely a notice of appeal to the Court of Special Appeals. We issued a writ of certiorari on our initiative, *Forster v. State,* 424 Md. 54, 33 A.3d 981 (2011), before the intermediate appellate court could decide the appeal. Appellant poses two questions for our consideration:

1. Did the lower court err in granting the motion to dismiss Forster's wrongful discharge cause of action where she clearly alleged that her employment was terminated because she refused in implement ultra vires orders from the Board of Trustees?

2. Did the lower court err in granting the motion to dismiss Forster's wrongful discharge cause of action where she plainly alleged that her employment was terminated because she refused to engage in unlawful activity as ordered by the Board, she refused to violate clear public policy and because she exercised her statutorily prescribed duties as the Maryland Public Defender?

The State re-introduced in its brief the failure to exhaust available administrative remedy ground advanced to, but undecided by, the Circuit Court:

3. Is Forster's wrongful discharge action barred by her failure to exhaust administrative remedies that were available to her as a State employee in the executive service under Title 11 of the State Personnel and Pensions Article?

We hold that a termination of an at-will State executive service employee triggers the primary administrative remedy provided by State Personnel and Pensions Article § 11–305, which requires terminated at-will State employees to appeal assertedly illegal or unconstitutional terminations through the administrative mechanism of § 11–113. Forster failed to do so, thus, she failed timely to exhaust the primary and available administrative remedy for her termination and her Circuit Court complaint for wrongful discharge is barred. Therefore, we do not reach the merits of whether the trial court erred in dismissing Forster's complaint for failure to state a claim upon

which relief may be granted. Accordingly, we affirm the judgment of the Circuit Court for Baltimore City.

## II. STANDARD OF REVIEW

When reviewing a trial court's grant of a motion to dismiss, we assume the truth of all well-pleaded facts and allegations in the complaint, as well as the reasonable inferences drawn from them, in a light most favorable to the non-moving party. *RRC Ne., LLC v. BAA Md., Inc.,* 413 Md. 638, 643, 994 A.2d 430, 433 (2010) (citing *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 121–22, 916 A.2d 257, 264–65 (2007)); *Sprenger v. Pub. Serv. Comm'n of Md.,* 400 Md. 1, 21, 926 A.2d 238, 249–50 (2007); *Pendleton v. State,* 398 Md. 447, 458, 921 A.2d 196, 203 (2007).

Appellate review of the grant of the motion to dismiss evaluates whether the trial court was correct legally. *Pendleton,* 398 Md. at 459, 921 A.2d at 203 (citing *Benson v. State,* 389 Md. 615, 626, 887 A.2d 525, 531 (2005)). To determine whether the trial court's judgment was correct legally in the present case, we encounter a question of statutory interpretation. We consider the interpretation of a statute without deference. *Breslin v. Powell,* 421 Md. 266, 286, 26 A.3d 878, 885 (2011) (citing *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002)).

The goal of statutory interpretation is to " 'ascertain and implement, to the extent possible, the legislative intent.' " *Smack,* 378 Md. at 304, 835 A.2d at 1178 (quoting *Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002)). An appellate court interprets a statute by first looking to its plain language, giving the words their natural and ordinary meaning. *Breslin,* 421 Md. at 286, 26 A.3d at 891 (citing *State Dep't of Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690, 696 (1997)). To determine the plain meaning of language, we consider also the statutory scheme in which the particular provision or provisions appear. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) (citing *Kaczorowski v. Mayor & City*

*Council of Balt.,* 309 Md. 505, 514, 525 A.2d 628, 632 (1987)) ("[The meaning of the plain language] is controlled by the context in which it appears."). If the language is clear and unambiguous on its face, our inquiry ends. *Id.* (citing *Marriott Emps. Fed. Credit Union v. MVA,* 346 Md. 437, 445, 697 A.2d 455, 458 (1997)). When two provisions of the large scheme appear to conflict, "the statutes may be harmonized by viewing the more specific statute as an exception to the more general one." *Gov't Emps. Ins. Co. v. Ins. Comm'r of Md.,* 332 Md. 124, 133, 630 A.2d 713, 718 (1993).

### III. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

■ We consider the State's contention, as a threshold question, that Forster's complaint was barred because she failed to exhaust an available and primary administrative remedy. In addition to Maryland Rule 8–131(a) indicating generally that we may consider issues "raised in *or* decided by the trial court," we may consider, sua sponte, whether available administrative remedies have been exhausted. *See, e.g., Md. Reclamation Assocs. v. Harford Cnty.,* 342 Md. 476, 490 n. 10, 677 A.2d 567, 574 n. 10 (1996) (" '[T]he exhaustion or exclusivity of an administrative remedy is . . . an issue' which 'an appellate court ordinarily will address even though [it was] not raised by a party' " (quoting *Moats v. City of Hagerstown,* 324 Md. 519, 525, 597 A.2d 972, 975 (1991))).

■ In the present context, the issue of administrative remedy exhaustion was raised by the State, but the Circuit Court declined to reach this threshold issue in its memorandum opinion, preferring to grapple directly with the sufficiency of Forster's pleading of her sole claim. This posture, however, does not preclude us from making the jurisdictional determination whether the claim is barred by the doctrine of administrative remedy exhaustion. In the interest of judicial efficiency, we may affirm the judgment of a trial court to grant a motion to dismiss on a different ground than that relied upon by the trial court, as long as the alternative

ground is before the Court properly on the record. *See City of Frederick v. Pickett,* 392 Md. 411, 424, 897 A.2d 228, 235 (2006) (stating that an appellate court can "affirm the dismissal 'on any ground adequately shown by the record, whether or not relied upon by the trial court'" (quoting *Berman v. Karvounis,* 308 Md. 259, 263, 518 A.2d 726, 728 (1987))); *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221, 1223 (1979) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943)) ("Considerations of judicial economy justify the policy of upholding a trial court decision which was correct although on a different ground than relied upon."). The administrative remedy exhaustion question is fleshed out sufficiently in the record of the present case and the parties' briefs.

 There is a general rule in Maryland courts that if there is an available primary administrative remedy provided by the Legislature, it must be exhausted before a party may seek relief from a court. *Sprenger,* 400 Md. at 24, 926 A.2d at 252 (citing *Prince George's Cnty. v. Ray's Used Cars,* 398 Md. 632, 651, 922 A.2d 495, 506 (2007)); *Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 63, 706 A.2d 1060, 1069 (1998) (stating that there is a "presumption that the administrative remedy is intended to be primary, and ... a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy").

## A. The Relevant Statutory Scheme

The administrative remedy available to Forster was provided by Title 11 of the State Personnel and Pensions Article, available to all State employees within the Executive Branch, with the exception of temporary employees. State Pers. & Pens. Art., § 11–102. Section 11–104 of the State Personnel and Pensions Article empowers generally an appointing authority to take disciplinary action against a State employee, including written reprimands, suspension without pay, and termination. Prior to disciplining an employee for misconduct, however, the appointing authority must "(1) investigate the alleged misconduct; (2) meet with the employee; (3)

consider any mitigating circumstances; (4) determine the appropriate disciplinary action, if any, to be imposed; and (5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights." State Pers. & Pens. Art., § 11–106.

If an employee fails to appeal disciplinary action in accordance with Title 11, the action is considered accepted by the employee. State Pers. & Pens. Art., § 11–108(b)(1). Appeals for employees in the management service, in the executive service, or who are appointed specially are governed specifically by § 11–113. As the head of a principal unit of State government,[4] the Public Defender is a position in the executive service. State Pers. & Pens. Art., § 6–404(a)(1). Under § 11–113, an appeal must be filed within 15 days after the employee receives notice of a disciplinary action taken against him or her. State Pers. & Pens. Art., § 11–113(b)(2)(i). Appeals under this section may challenge the disciplinary action based only on grounds that the discipline was illegal or unconstitutional; the employee bears the burden of proof. State Pers. & Pens. Art., § 11–113(b)(2)(ii), (b)(3). The appeal is taken to the head of the principal unit where the employee is, or was, employed, whose decision on the appeal is the final administrative decision. State Pers. & Pens. Art., § 11–113(d)(3).

Termination of State employees in the management and executive services, as well as special appointees, is governed also by State Personnel & Pensions Article, § 11–305. This provision states that employees subject to its terms are at-will employees who serve at the pleasure of the appointing author-

---

4. A " 'principal unit' means: (1) a principal department or other principal independent unit of State government; or (2) for an employee of a county board of elections whose employees are covered by this article, the county board of elections." Maryland Code (1994, 2009 Repl.Vol.), State Pers. & Pens. Art., § 1–101(k). Section 6–404(a)(1) of the State Personnel and Pensions Article provided that "the chief administrator of a principal unit or a comparable position that is not excluded from the State Personnel Management System under § 6–301 of this title as a constitutional or elected office ..." is a member of the executive service. State Pers. & Pens. Art., § 6–404(a)(1).

ity and "may be terminated for any reason that is not illegal or unconstitutional, solely in the discretion of the appointing authority." State Pers. & Pens. Art., § 11–305(b). When executive branch employees are terminated under § 11–305 they may file a written appeal under § 11–113. State Pers. & Pens. Art., § 11–305(d). No notice by the appointing authority to the fired employee of the availability of the appeal right is required under § 11–113.

## B. Relevant Cases

We explored the statutory cross-currents of State employee terminations in *Smack*, concluding that a probationary employee could be terminated without regard to the pre-termination procedural/substantive requirements of § 11–106. 378 Md. at 314, 835 A.2d at 1184. Stephanie Smack was a social worker still in her mandatory six-month probationary period required by State Personnel & Pensions Article, § 7–402(a), when she was terminated for failing to attend and conduct a weekly group therapy session with clients in her charge. *Smack*, 378 Md. at 302, 835 A.2d at 1177. Smack appealed her termination under § 11–110, but an Administrative Law Judge ("ALJ") of the Maryland Office of Administrative Hearings (acting by delegation for the Secretary of the Department of Health and Mental Hygiene) concluded that termination of a probationary employee, because of the nature of the probationary class of employment, could not be for "misconduct" and, therefore, Smack was not entitled to the protective pre-termination requirements provided by § 11–106. *Smack*, 378 Md. at 303, 835 A.2d at 1177–78. The Circuit Court for Worcester County and the Court of Special Appeals agreed with the ALJ. *Smack*, 378 Md. at 303–04, 835 A.2d at 1178.

Before this Court, Smack argued that § 11–106 applied to disciplinary actions based on misconduct taken against any category of State employee, except a temporary employee; thus, her purported termination was subject to the preliminary procedures of § 11–106 not followed by the employer. *Smack*, 378 Md. at 303, 835 A.2d at 1177–78. We noted that the termination, demotion, or removal of a probationary em-

ployee is governed specifically by two subsections, §§ 11–303 and 11–304. *Smack*, 378 Md. at 309, 835 A.2d at 1181. Relying on the precept of statutory construction that when two statutes appear conflicting, and one is general and the other specific (" 'the statutes may be harmonized by viewing the more specific statute as an exception to the more general one' "), we determined that § 11–303 governed Smack's termination. *Smack*, 378 Md. at 306, 835 A.2d at 1179 (quoting *Gov't Emps. Ins. Co.*, 332 Md. at 133, 630 A.2d at 718). Section 11–303 contains stand alone procedures (notice, appeal, suspension) for the termination of probationary employees and does not refer to any other sections of the State Personnel and Pensions Article to layer additional procedures. *Smack*, 378 Md. at 312, 835 A.2d at 1183. Section 11–106 applies also to disciplinary procedures generally, including termination, against probationary employees, creating the appearance of a conflict with § 11–303. *Id.*

Chief Judge Bell, writing for the Court in *Smack*, noted that, because § 11–303 is focused narrowly on only one form of discipline, termination, the two sections "can be reconciled by treating § 11–303, the more specific of the two, as an exception to § 11–106, the more general." *Id.* He concluded that where "there is a provision that specifically, and without any doubt, addresses the termination, as opposed to the discipline generally, of probationary employees, that provision must control over a provision that applies, but only generally, as § 11–106 does." *Smack*, 378 Md. at 313, 835 A.2d at 1183. Providing a separate procedure for termination of probationary employees does not render § 11–106 illogical or inconsistent because the General Assembly permitted the appointing authority "to take disciplinary action against a probationary employee or to terminate that employee, both in accordance with Title 11." *Smack*, 378 Md. at 314, 835 A.2d at 1183 (internal quotations omitted). Thus, whenever a probationary employee is disciplined, short of termination, § 11–106 applies as pre-discipline required steps. *Smack*, 378 Md. at 315, 835 A.2d at 1184–85.

In *Public Service Commission v. Wilson*, 389 Md. 27, 34, 882 A.2d 849, 853 (2005), Chrys Wilson, a management service employee with the Maryland Public Service Commission ("PSC"), was terminated purportedly (along with four other employees) by the then-Chair of the PSC, Kenneth Schisler. Shortly after the terminations, at the request of the terminated employees, an Assistant Attorney General authored an opinion letter concluding that the Chair, acting without the authorization of the other Commissioners of the PSC, could not alone terminate a management service employee. *Wilson*, 389 Md. at 35, 882 A.2d at 854. Wilson filed an administrative appeal, under § 11–113, contending her termination was illegal and unconstitutional. *Wilson*, 389 Md. at 36, 882 A.2d at 854. Chair Schisler, as head of the principal unit, presided over and rejected Wilson's appeal, explaining that Wilson was an at-will employee not fired "for cause" and, therefore, not entitled to a pre-termination hearing under § 11–106. *Wilson*, 389 Md. at 37, 882 A.2d at 855. Schisler explained that Wilson "did not possess sufficient skills, judgment, or work ethic to perform in her position" and, although he suspected previously Wilson may have misrepresented her time sheet hours, there was insufficient evidence of wrongdoing on that score and this was not a reason for Wilson's termination. *Wilson*, 389 Md. at 35, 882 A.2d at 854. Schisler concluded also that he did not need the approval or delegation of the other Commissioners of the PSC to fire Wilson. *Wilson*, 389 Md. at 37, 882 A.2d at 855.

Wilson sought judicial review in the Circuit Court, which ordered her reinstatement based on its determination of an unlawful termination by the Chair acting alone. The court opined that only a majority of the PSC Commissioners could terminate Wilson. It directed that any subsequent administrative appeal on remand could not be presided over by Schisler or his staff. *Wilson*, 389 Md. at 38–39, 882 A.2d at 856. Compliant with the judgment of the Circuit Court, the PSC sent a letter to Wilson reinstating her; however, the same letter re-terminated her by a majority vote of the Commissioners and gave her notice of her rights to appeal administratively the new termination action. *Wilson*, 389 Md.

at 39, 882 A.2d at 856. Wilson did not appeal administratively the second termination.

The PSC sought concurrently an appeal to the Court of Special Appeals from the Circuit Court judgment and filed contemporaneously a motion with the Circuit Court to reconsider that aspect of its judgment awarding back pay and benefits to Wilson. *Wilson*, 389 Md. at 39, 882 A.2d at 856–57. Wilson, for her part and in response to the PSC's escalation, sought from the Circuit Court an order of contempt against the PSC based on her re-termination. *Wilson*, 389 Md. at 40, 882 A.2d at 857. The Circuit Court issued a second order reiterating the findings of its prior order and adding that Wilson's re-termination was illegal because she was fired "for cause" as the result of alleged misconduct, without the proper statutory pre-termination protections of § 11–106 and that the firing was unconstitutional due to biased decision-makers. *Id.* The PSC filed a second notice of appeal with the Court of Special Appeals from this action, but we issued a writ of certiorari before the intermediate appellate court decided the case. *Wilson*, 389 Md. at 41, 882 A.2d at 857.

Wilson argued that although her second termination was effected by a majority of the PSC Commissioners, it was illegal because she was not afforded the required pre-termination notice when an employee is terminated "for cause" and, alternatively, that if she was fired for no reason as an at-will employee, the appeal process offered to her was unconstitutional because Chair Schisler (who fired her initially) would preside over the appeal and could not be impartial. *Wilson*, 389 Md. at 49, 882 A.2d at 868. As a starting point in analyzing at-will employee termination generally, we noted that courts and juries may not review the motivation or factual basis behind an employer's decision to terminate, and that decision, absent a "contravening public policy," may be unreviewable even if arbitrary, capricious, or even fundamentally unfair. *Wilson*, 389 Md. at 61 n. 21, 882 A.2d at 869 n. 21 (citing *Towson Univ. v. Conte*, 384 Md. 68, 82–83, 862 A.2d 941, 949 (2004)).

We assumed, rhetorically (without deciding) for the purposes of analyzing Wilson's claim, that the appointing authority's actions were constrained by § 11–106 when an at-will employee is disciplined for misconduct. *Wilson,* 389 Md. at 61, 882 A.2d at 869 (citing *Danaher v. Dep't of Labor, Licensing & Regulation,* 148 Md.App. 139, 166, 811 A.2d 359, 375 (2002)) (holding that § 11–106 applies to at-will employees in the management service). "Misconduct" is not defined in the State Personnel and Pensions Article. We looked to the statutory history of the State system governing terminations, related regulations, dictionary definitions, and other cases to evaluate Wilson's claim that she was terminated for misconduct. *Wilson,* 389 Md. at 61, 882 A.2d at 869. Examining the Code of Maryland Regulations governing professional service with the State, we noted that "misconduct" involves "negligence, willful disregard of one's duties, failure to comply with employer regulations, knowingly violating a statute, or the commission of a criminal act," while discharge for performance implicated incompetence or inefficiency. *Wilson,* 389 Md. at 74–75, 882 A.2d at 877. Adopting a definition from an unemployment compensation case, we concluded that "misconduct," for the purposes of analyzing Wilson's claim, meant

"a transgression of some established rule or policy of the employer, the commission of a forbidden act, a dereliction of duty, or a course of wrongful conduct committed by an employee, within the scope of his employment relationship, during hours of employment, or on the employer's premises."

*Wilson,* 389 Md. at 77, 882 A.2d at 879 (quoting *Dep't of Labor, Licensing & Regulation v. Hider,* 349 Md. 71, 85, 706 A.2d 1073, 1079 (1998)). Under these assumptions, we concluded that nothing in Wilson's alleged, on-the-job behavior rose to the level of misconduct, nor could the performance issues alleged regarding her employment constitute a "dereliction of duty." *Wilson,* 389 Md. at 78, 882 A.2d at 879–80. Dereliction of duty involves "lacking a sense of duty; in breach of a legal or moral obligation." *Id.* The Court concluded that "in order to rise to the level of 'employee misconduct,'

the alleged conduct would need to involve some element of wrongdoing, culpable negligence, or breach of a legal or moral obligation." *Wilson,* 389 Md. at 78, 882 A.2d at 880. Based on the record before us, we determined that Wilson's termination was not due to misconduct and she was not entitled on that basis to the pre-termination procedural protections of § 11–106. *Wilson,* 389 Md. at 78–79, 882 A.2d at 880.

Acknowledging that § 11–106 serves to protect at-will employees from discipline on the basis of unsubstantiated accusations, however, we concluded that "if it appears that a disciplinary action may have been based, even *sub silentio,* on alleged facts constituting "employee misconduct," the "appointing authority" must be held accountable to follow the procedures outlined in § 11–106." *Wilson,* 389 Md. at 82–83, 882 A.2d at 882. We noted further that when management service employees are disciplined, they bear the burden of proof to show that the proper procedures were not followed, and absent "such a demonstration, a termination or other discipline of an at-will employee, without a reason being given and without obeisance to the statutory procedures in § 11–106, is not unlawful necessarily." *Wilson,* 389 Md. at 84, 882 A.2d at 883.

We declined to decide whether Wilson's unpursued administrative appeal from the second termination would have been futile or unfair in a constitutional sense because Chair Schisler might preside over it. Our declination to reach this issue was because Wilson failed to pursue, i.e., exhaust, "the specific administrative remedy provided by statute when a management service, at-will employee of the PSC is terminated for other than misconduct." *Wilson,* 389 Md. at 88–89, 882 A.2d at 885–86. Quoting from *SEFAC Lift & Equipment Corporation v. Mass Transit Administration,* 367 Md. 374, 380, 788 A.2d 192, 196 (2002), we reiterated that

[w]e have long held, and have recently confirmed, that where an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision

before resorting to the courts for resolution of the controversy.

*Wilson,* 389 Md. at 89, 882 A.2d at 886 (internal quotations and citations omitted). We noted that § 11–113 allowed Wilson to challenge the illegality or constitutionality of her second termination in an administrative appeal taken within 15 days of receiving notice of the action. *Wilson,* 389 Md. at 92, 882 A.2d at 888. We concluded that Wilson was barred by the doctrine of administrative exhaustion from seeking alternative redress in the Circuit Court. *Id.* Wilson urged this Court, if we determined she was not terminated "for cause," to remand the case back to the trial court for further discovery to determine whether she was terminated, as she claimed, by the Republican-dominated PSC Commissioners because of her political affiliation as a Democrat. *Wilson,* 389 Md. at 93, 882 A.2d at 888–89. This request too was barred because Wilson failed to exhaust her administrative remedies. *Id.*

## C. The Present Case

Forster argues that this Court cannot decide the issue of administrative remedy exhaustion because the trial court did not dismiss her complaint on this ground. As discussed *supra* in Part III, we may consider and decide this issue regardless of whether the trial court relied upon this basis to dismiss Forster's complaint. Forster contends also that additional fact-finding, after discovery, must be allowed to determine what notice of her administrative appellate rights she was provided and whether she was terminated for misconduct, specifically insubordination. *Smack* guides us in deciding these contentions.

In *Smack,* we concluded that, because a provision, § 11–303, in the State Personnel and Pensions Article, applied specifically to termination of probationary employees, rather than to discipline of State employees generally, § 11–303 regulated terminations of probationary employees exclusively. *Smack,* 378 Md. at 313, 835 A.2d at 1183. Employee misconduct that is the gravamen of disciplinary proceedings up to, but not

including termination, however, was governed by § 11–106.[5]
*Smack*, 378 Md. at 315, 835 A.2d at 1185.

Section 11–305, which governs termination of at-will employees, including those in the executive service, is analogous to § 11–303, governing termination of probationary employees. Like § 11–303, § 11–305 applies only to targeted categories of State employees. The categories targeted by § 11–303 and § 11–305 are employees with limited rights to continued employment. Section 11–305(b) makes clear that executive service employees, like Forster, are at-will employees that may be terminated for any (or no) reason as long as the action was not infected by illegality or unconstitutionality, which grounds are recognized expressly in the statutory scheme as having to be raised initially and decided in an administrative appeal. This is the fundamental structure of an at-will employment relationship that we cautioned against disrupting in *Wilson*, 389 Md. at 83, 882 A.2d at 882.

The plain language of § 11–305 covers all terminations of at-will employees for any cause, or no cause at all. At-will employees may be terminated at any time, so long as the termination is not politically-motivated, illegal, or unconstitutional. Section 11–305 contains no provision exempting terminations due to misconduct, nor any reference to § 11–106. Section 11–305, like § 11–303 discussed in *Smack*, contains a separate appeal provision, which limits to illegality or unconstitutionality the grounds upon which an appeal may be maintained. Section 11–305 is a specific statutory provision providing procedures available only to termination of at-will

---

5. We note that under our definition of employee misconduct, explored in-depth in *Wilson*, Forster's actions leading to her termination would not rise to the level of misconduct. Forster advances the theory that her refusal to implement the Board of Trustee's demanded changes could be classified as insubordination. This theory is unpersuasive, however, because it is eroded by Forster's equally passionate contention that the Board did not have the legal authority "to order me, as you do in your letter, to demote, fire and hire various personnel, or, in fact, to order me to do anything at all."

employees and, therefore, as in *Smack*, is an exception to the more general disciplinary procedures in § 11–106.[6]

 Forster's termination, as an executive service employee, was governed by § 11–305 exclusively. Forster's argument that her termination was illegal and unconstitutional would have been in the wheel-house of an administrative appeal challenging an at-will employee termination; however, her claims were asserted too late and in the wrong forum in the present litigation. Forster did not appeal administratively (in writing and within 15 days) her termination under § 11–113, as directed by § 11–305(d). Because she did not appeal her termination, the doctrine of exhaustion of administrative remedies bars her complaint for wrongful discharge in the Circuit Court. Forster's claim that she did not receive written notice of her appeal rights fails also because § 11–305 does not contain a notice provision and no notice is required by § 11–113.

 Forster argues alternatively that because she was the head of a principal unit, when she was fired she could not file an appeal to herself. This claim has no merit. When the Board majority voted to terminate Forster, it appointed (virtually concurrently) an interim Public Defender. Forster's 21 August 2009 termination letter from the Board provided this information to her. Forster does not dispute that there was an interim head of the principal unit and does not explain why she did not appeal to that person or the Board.[7]

---

**6.** Our holding does not conflict with *Wilson*, discussed *supra*. In *Wilson*, we assumed rhetorically (without deciding), for the sake of evaluating Wilson's argument, that § 11–106 applied to executive service employees terminated for misconduct, noting as a basis for the arguendo assumption the Court of Special Appeals's holding in *Danaher*. Our ultimate conclusion in *Wilson*, however, was not based on this assumption. Our commentary on § 11–106's arguable applicability was obiter dictum and does not foreclose our holding here. *Smack* directs the analysis employed in the present case.

**7.** We note also that the Maryland Administrative Procedures Act allows the Office of the Public Defender to delegate hearing authority to the Office of Administrative Hearings ("OAH"). Md.Code (1984, 2009

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE CITY AFFIRMED. COSTS TO BE PAID BY
APPELLANT.

BATTAGLIA and ADKINS, JJ., Concur and Dissent.

ADKINS, J., concurring and dissenting, in which
BATTAGLIA, J., joins.

I concur with the Majority's judgment, in the sense that I
agree Nancy S. Forster should not prevail in her appeal, but I
disagree that her appeal should be dismissed on grounds she
failed to exhaust administrative remedies. I would affirm the
Circuit Court on the grounds used in its decision—that For-
ster has not stated a claim for wrongful discharge.

Although the Majority devotes much attention to Forster's
notice argument, it gives short shrift to her statutory interpre-
tation argument. Forster contends that Maryland Code
(1994, 2009 Repl.Vol.), Section 11–113 of the State Personnel
and Pensions Article should not be read to require that, when
the head of a principal unit is disciplined, her road to judicial
review must include an appeal to herself or her replacement.
Such an interpretation, she says, would violate the cardinal
rule of statutory interpretation precluding results that are
"absurd" and "nonsensical." *See City of Bowie v. Prince
George's County,* 384 Md. 413, 426, 863 A.2d 976, 983 (2004)

---

Repl.Vol.), State Gov't Art., § 10–205. In the event that an at-will
employee, who is also the head of a principal unit, challenges his/her
termination and argues that the interim head or appointing authority
cannot be unbiased, the OAH can provide a neutral forum for an
appeal. We concluded in *Spencer v. Maryland State Board of Pharmacy,*
where a pharmacist asserted that the Board of Pharmacy *must* refer her
case to the OAH because it was biased impermissibly when certain
Board members participated in settlement discussions prior to a hear-
ing, that the Board was not *required* to send the case to the OAH, but it
could take steps to remove or replace the allegedly biased Board
members, or send the case to the OAH for fact-finding, but retain final
decision-making authority. 380 Md. 515, 532–33, 846 A.2d 341, 351
(2004). Referral of a case to the OAH is a discretionary action by an
administrative agency that is reviewed under the deferential arbitrary
and capricious standard according to the relevant circumstances of
each case. *Spencer,* 380 Md. at 532–33, 846 A.2d at 351–52.

("In discerning the legislative intent absurd results in the interpretive analysis of a statute are to be shunned." (citation and quotation marks omitted)); *Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results. In other words, we should reject a proposed statutory interpretation if its consequences are inconsistent with common sense." (citations and quotation marks omitted)).[1]

As Justice Stone said in *United States v. Katz*, a statute should be construed narrowly "where the literal application of the statute would lead to extreme or absurd results, and where the legislative purpose gathered from the whole Act would be satisfied by a more limited interpretation." *United States v. Katz*, 271 U.S. 354, 362, 46 S.Ct. 513, 516, 70 L.Ed. 986 (1926). *Bowie* applied this rule to an administrative exhaustion issue, *see* 384 Md. at 424–27, 863 A.2d at 982–84, and other jurisdictions have used it to deny motions asserting failure to exhaust administrative remedies, *see, e.g., United States v. Dorsett*, 308 F.Supp.2d 537, 544 n. 10 (D.V.I.2003) ("In this case, however, it would be absurd to find that Dorsett did not exhaust administrative remedies[.]"); *Gwinn v. Collier*, 247 Va. 479, 443 S.E.2d 161, 163 (1994) (declining to require administrative exhaustion because it would "involve a manifest absurdity"). Thus, this basic rule of statutory interpretation clearly applies in this case and should receive our full attention.

## The Majority's Reliance on *Wilson*

Instead of addressing the statutory interpretation question, however, the Majority falls back on *Pub. Serv. Comm'n v.*

---

1. Forster's argument is based on the portion of the statute providing that a Section 11–113 appeal goes to the head of the principal unit. *See* Maryland Code (1994, 2009 Repl.Vol.), Section 11–113(b)(1) of the State Personnel and Pensions Article ("An employee or an employee's representative may file a written appeal of a disciplinary action with the head of the principal unit."). Forster, of course, was the head of the principal unit in this case. *See* Maj. Op. at 582, 45 A.3d at 190.

*Wilson,* 389 Md. 27, 882 A.2d 849 (2005), in which we rejected a terminated employee's claim that she should have been excepted from the administrative appeal requirement because her appeal would have been decided by the same person who terminated her. To be sure, both Wilson and Forster alleged bias in the administrative appeal, but *Wilson* does not control here because we based that holding on a different rule.

A. Wilson's *Constitutional Rule is not Applicable Here*

As we explained, Wilson mounted a constitutional challenge to the exhaustion requirement, arguing that "under Article 24 of the Maryland Declaration of Rights ('Article 24'), she was entitled to a fair and impartial agency adjudicator." *Wilson,* 389 Md. at 88, 882 A.2d at 885. She argued that, because the hearing officer was the same person who fired her, "she need not exhaust the administrative process following re-termination because he was *unconstitutionally* biased against her." *Id.* at 91, 882 A.2d at 887. We declined to address the merits of that argument, however, citing a rule specific to constitutional challenges:

> Although we recognize that a constitutional challenge to a statute or regulation on its face may provide an exception to the normal application of the exhaustion doctrine, we conclude that that exception is not applicable here because Wilson's constitutional challenge is framed as an "as applied" one.

*Id.*

Thus, our holding in *Wilson* was based on a narrow rule pertaining specifically to constitutional challenges to exhaustion requirements. *See also* Arnold Rochvarg, *Principles & Practice of Maryland Administrative Law* (2011) ("The first step in the constitutional exception analysis is that the attack must be made to the constitutionality of a statute as a whole.") (citing *Goldstein v. Time–Out Family Amusement Ctrs., Inc.,* 301 Md. 583, 483 A.2d 1276 (1984)). Because the constitutional rule decided the case, we did "not reach or decide the issue of whether Wilson was deprived unconstitutionally of a fair and impartial agency adjudicator[.]" *Wilson,* 389 Md. at 88–

89, 882 A.2d at 886. We simply held that when the alleged constitutional bias takes the form of an "as applied" challenge, it must be raised in the administrative forum first. *Id.* Indeed, our discussion suggested that Wilson could have shown unconstitutional bias if she had raised the issue in the administrative appeal. *See id.* at 90, 882 A.2d at 887 ("Had the Chairman decided the appeal ... [Wilson] would have taken from the Chairman and the Commission the argument they make here that the Commission intended to delegate that responsibility to another.").

*Wilson* does not apply here because we are not faced with any constitutional issue. Forster, instead of raising constitutional arguments, simply argues that Section 11–113 cannot rationally be interpreted as applying to the head of a principal unit. Indeed, she refers to the Respondent's (and the Majority's) interpretation of Section 11–113 as "nonsensical," "absurd," and "legally baseless," but never calls the procedure "unconstitutional" or "illegal." Our application of the constitutional rule in *Wilson,* therefore, presents no obstacle to Forster's statutory interpretation argument.

### B. Wilson *did not Involve a Direct Pecuniary Conflict of Interest*

*Wilson* is distinguishable for a second, more important reason, which is that the conflict of interest here is direct and pecuniary, whereas the bias alleged in *Wilson* was not. Wilson asked us to hold that any employer responsible for a termination decision would not be able to fairly review that decision in an administrative appeal. This Court rejected that notion, refusing to assume that "some kind of blind pride of authorship or hubris of power renders an administrative decision-maker *ipso facto* unable to assess fairly and objectively arguments that his or her decision should be revisited, changed, or abandoned." *Wilson,* 389 Md. at 92, 882 A.2d at 888. We also observed that "the record in this case does not reveal a factual predicate for specific personal bias against Wilson[.]" *Id.*

Here, in contrast, we are not merely dealing with "some kind of blind pride of authorship or hubris," but instead must

address a specific conflict of interest, in which the adjudicator has a direct pecuniary interest in the outcome of the case. If we interpret Section 11–113 to apply to the head of a principal unit, then in the case of a dismissal, as here, the hearing officer would be asked to decide whether to reinstate Petitioner; thereby ejecting herself from her new job. *See, e.g., Bruno v. Crown Point,* 950 F.2d 355, 360 (7th Cir.1991) (holding that it is proper to restore an employee to her rightful position "even where incumbents are bumped from their jobs because those incumbents would not have been hired if the [unlawful employment action] had not occurred.").[2] The inherent bias of the adjudicator is much more invasive in cases like this, where the status of the adjudicator's job cannot be separated from the status of the appellant's job. This sort of built-in bias is qualitatively different from, and much more powerful than, any leaning a neutral arbiter (such as that in *Wilson*) might bring to bear upon reconsidering his decision. When a hearing officer has a direct pecuniary interest in the outcome of the case, fair adjudication is impossible.[3]

*Wilson* does not support or justify the incestuous process that is condoned by the Majority. This analysis does not

---

**2.** Moreover, in the case of discipline short of dismissal, the unit head would remain in her position, thus being forced to adjudicate her own grievance. Both situations create a conflict of interest by giving the hearing officer a direct pecuniary interest in the outcome of the case.

**3.** *See, e.g., Ward v. Monroeville,* 409 U.S. 57, 59–60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972) (holding that an administrative hearing officer who received a portion of the "fees and costs levied by him against alleged violators" had a conflict of interest because he "occupie[d] two practically and seriously inconsistent positions, one partisan and the other judicial"); *Tumey v. Ohio,* 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927) (holding that a litigant "was entitled to halt the trial because of the disqualification of the judge, which existed both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village"); *Noriega–Perez v. United States,* 179 F.3d 1166, 1187 (9th Cir.1999) (Ferguson, J., dissenting) ("[T]here is no escaping the fact that the ALJ who is deciding the case necessarily has a conflict of interest because any fine levied by the ALJ will go to the branch of government controlling the ALJ.").

change simply because, in this case, Forster's immediate successor was an interim replacement. *See* Maj. Op. at 591, 45 A.3d at 195. Interim replacements often seek to make their positions permanent, and in any case, a permanent replacement could have been installed by the time Forster's appeal would have been considered.

For these reasons, I submit, an interpretation of Section 11–113 that requires the head of a principal unit to appeal to herself or her replacement is "inconsistent with common sense" and would "lead to absurd results," and I would reject it. *Blandon,* 304 Md. at 319, 498 A.2d at 1196.

### The Office of Administrative Hearings

The Majority suggests that this absurd result was avoidable because Forster's replacement could have delegated the hearing to the Office of Administrative Hearings ("OAH"). *See* Maj. Op. at 591–92 n. 7, 45 A.3d at 195–96 n. 7. I disagree that a Section 11–113 appeal may be referred to OAH.

Title 11 allows for referral to OAH under one section only, Section 11–110, which describes in some detail the procedures applicable at OAH.[4] In contrast, the sections of Title 11 at issue here (Sections 11–305 and 11–113) do not mention OAH

---

**4.** Maryland Code (1994, 2009 Repl.Vol.), Section 11–110 of the State Personnel and Pensions Article provides:

(b) *Action required by Secretary after receiving appeal.*—
Within 30 days after receiving an appeal, the Secretary or designee shall:
(1)(i) mediate a settlement between the employee and the unit; or
(ii) refer the appeal to the Office of Administrative Hearings; and
(2) advise the employee in writing of the Secretary's action.
(c) *Action required by Office of Administrative Hearings after receiving appeal.*—(1) Within 30 days after receiving the appeal, the Office of Administrative Hearings shall schedule a hearing and notify the parties of the hearing date.
(2) The Office of Administrative Hearings shall dispose of the appeal or conduct a hearing on each appeal in accordance with Title 10, Subtitle 2 of the State Government Article. The Office is bound by any regulation, declaratory ruling, prior adjudication, or other settled, preexisting policy, to the same extent as the Department is or would have been bound if it were hearing the case.

at all. Rather, as the Majority observes, the procedure at issue here is a unique and narrowly specified appeal right, limited to (1) grounds of illegality or unconstitutionality and (2) "targeted categories of State employees ... with limited rights to continued employment." Maj. Op. at 590, 45 A.3d at 195. Appeals under Section 11–110, on the other hand, are available generally to employees in the skilled or professional services and are not limited to any specific grounds.[5]

The distinction between Section 11–110 and Section 11–113 is further confirmed by legislative history. Both appeal rights were created by the State Personnel Management System Reform Act of 1996,[6] and from the outset they were meant to be separate. The task force that studied the implementation of the Act observed that "employees in the Management or Executive Service, or who are special appointees, have **different disciplinary appeal procedures**." *See* Task Force to Reform State Personnel, *Highlights of the State Personnel*

---

(d) *Additional action by Office of Administrative Hearings; final administrative decision.*—(1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:
(i) uphold the disciplinary action;
(ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or
(iii) order:
1. reinstatement to the position that the employee held at dismissal;
2. full back pay and benefits; or
3. both 1 and 2.
(2) Within 45 days after the close of the hearing record, the Office of Administrative Hearings shall issue to the parties a written decision.
(3) The decision of the Office of Administrative Hearings is the final administrative decision.
(4) The principal unit that employs the employee shall pay all costs related to the appeal that are incurred by the Office of Administrative hearings.

5. Section 11–110 appeals must be preceded by a decision in a Section 11–109 appeal, which is available to "employees in the skilled service or the professional service." *See* Section 11–109(a)(1); Section 11–110(a)(1) ("Within 10 days after receiving a decision under § 11–109 of this subtitle, an employee or an employee's representative may appeal the decision in writing to the Secretary.").

6. *See* Chapter 347 of the Acts of 1996.

*Management System Reform Act of 1996* (1997) (emphasis added). In 2002, the Legislature singled out Section 11–113, limiting it to special appointees and employees in the management and executive services. *See* Chapter 296 of the Acts of 2002. No such limitation was applied to Section 11–110. The Legislature returned to Section 11–113 in 2007, limiting the grounds for appeal to illegality or unconstitutionality. *See* Chapter 592 of the Acts of 2007. No such limitation was applied to Section 11–110. Indeed, in 2006 the Legislature expanded OAH's authority under Section 11–110, allowing it to reinstate employee benefits and impose costs upon the principal unit. *See* Chapter 553 of the Acts of 2006; Chapter 600 of the Acts of 2006. No such powers were added under Section 11–113.

With two separate appeal procedures, and only Section 11–110 mentioning OAH, the clear message is that the Legislature did not intend for Section 11–113 appeals to be referred to OAH. *See Gardner v. State,* 420 Md. 1, 11, 20 A.3d 801, 807 (2011) ("[W]here Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993)) (citations and quotation marks omitted)).

Moreover, as the Court of Special Appeals explained in *Dozier v. Dep't of Human Res.,* 164 Md.App. 526, 533–37, 883 A.2d 1025, 1029–31 (2005), it would not make sense to refer a Section 11–113 appeal to OAH, because it is not a "contested case." Only "contested cases," as defined in the Maryland Administrative Procedure Act, may be referred to OAH.[7] As *Dozier* correctly observes, Section 11–113 does not contain the

---

7. *See* Arnold Rochvarg, *Principles and Practice of Maryland Administrative Law* (2011), § 9.4 ("OAH exists as a central hearing agency to hold **contested case hearings** for other agencies.... [A]gencies not governed by Subtitle 2 of the Maryland APA [titled "Contested Cases"] **are not covered** by the statutes that set forth OAH powers." (emphasis added)); *see also* Maryland Code (1984, 2009 Repl.Vol.), § 10–205 of the State Government Article (providing that the "agency head authorized to

elements traditionally associated with "contested cases," including "trial type" procedures and mandatory hearings. *Id.* at 534–36, 883 A.2d at 1029–31 (quoting *Sugarloaf v. Ne. Md. Waste Disposal Auth.,* 323 Md. 641, 651 n. 5, 594 A.2d 1115, 1119 n. 5 (1991) ("contested case" means "a hearing which provides trial type procedures, such as cross-examination")).[8, 9] An appeal under Section 11–113, on the other hand, accords the appellant no trial or hearing rights, and merely gives the head of the principal unit the **option** to confer with the employee before making a decision. *See* Section 11–113(c) ("The head of the principal unit may confer with the employee before making a decision."). Thus, quite sensibly, the Legislature has provided only a limited right of appeal for those persons holding the highest management positions in each agency.[10] Without the option of referral to OAH, Forster's appeal would have come before her replacement, who would

conduct a **contested case hearing** shall: (i) conduct the hearing; or (ii) delegate the authority to conduct the **contested case hearing** to [OAH or another person approved by OAH]" (emphasis added)).

8. The definition of "contested case" under the State Government Article is found in Section 10–202(d):
 (1) "Contested case" means a proceeding before an agency to determine:
 (i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or
 (ii) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing.
 (2) "Contested case" does not include a proceeding before an agency involving an agency hearing required only by regulation unless the regulation expressly, or by clear implication, requires the hearing to be held in accordance with this subtitle.

9. In a contested case, "each party is entitled to ... (1) call witnesses; (2) offer evidence, including rebuttal evidence; (3) cross-examine any witness that another party or the agency calls; and (4) present summation and argument." Maryland Code (1984, 2009 Repl.Vol.), § 10–213(f) of the State Government Article.

10. *See* Section 11–113(a) ("This section only applies to an employee (1) *in the management service;* (2) *in the executive service; or* (3) *under a* special appointment described in § 6–405 of this article."); Section 6–

have had a direct conflict of interest.[11] Again, I believe this result is patently absurd, and therefore not a legitimate interpretation of the statute. *See Bowie*, 384 Md. at 426, 863 A.2d at 983.[12]

## Goals of Exhaustion

The goals of administrative exhaustion are not advanced by the Majority's holding. The central goal of administrative

404 ("executive service" means the following high-ranking positions in the Executive Branch: "(1) the chief administrator of a principal unit or a comparable position that is not excluded from the State Personnel Management System under § 6–301 of this title as a constitutional or elected office; and (2) a deputy secretary or assistant secretary of a principal unit or a position that the Secretary determines has similar stature. (b) Other positions.—The executive service includes any other position that is determined by the Secretary to be in the executive service"); Section 6–403 ("management service" means any position in the Executive Branch that "(1) primarily involves direct responsibility for the oversight and management of personnel and financial resources; (2) requires the exercise of discretion and independent judgment; and (3) is not in the executive service. (b) Other positions.—The management service includes any other position that is determined by the Secretary to be in the management service"); Section 6–405(a) (listing the high-ranking appointments that qualify as "special appointees").

11. Moreover, as the Majority observes, the decision to refer a hearing to OAH is within the sole discretion of the agency, and is reviewed under the deferential "arbitrary and capricious" standard. Maj. Op. at 591–92 n. 7, 45 A.3d at 195–96 n. 7. Thus, practically speaking, it would be impossible for an aggrieved employee to demand that an administrative appeal be referred to OAH. *See Spencer v. State Bd. of Pharm.*, 380 Md. 515, 533, 846 A.2d 341, 351 (2004) ("The reviewing court, absent some showing of fraud or egregious behavior on behalf of the agency, will be hard pressed to articulate a reason why the agency acted arbitrarily or capriciously when it did not send the case to the OAH.... Even conceding the error of the Board's failure to recuse certain members from the panel, that alone does not suffice to render arbitrary or capricious the Board's decision not to refer to the OAH." (emphasis added; citations and quotation marks omitted)); *see also* Rochvarg, § 9.4 ("Agencies can choose whether to use or not use OAH.").

12. The Majority also suggests that Forster's administrative appeal could have gone to the Board instead of her replacement, *see* Maj. Op. at 591, 45 A.3d at 195, but that option is not in the statute because, as the Majority observes, the statute provides for appeal to the head of the principal unit only, and the Public Defender is the head of the principal unit in this case, *see* Maj. Op. at 582, 45 A.3d at 190.

exhaustion—conservation of judicial resources—would not likely be advanced because the agency ruling would likely be adverse to Forster, and she would be left to seek relief in the courts. Indeed, forcing Forster to explain and argue the hearing officer's conflict of interest, in addition to the merits of her case, has created additional, unnecessary work for the courts. This runs contrary to the goal of conserving judicial resources. *See* Rochvarg, § 14.14 (explaining that when "the case will most likely require judicial involvement to obtain the proper remedy . . . one of the main goals of the exhaustion doctrine—judicial economy—would not be served by requiring exhaustion"). Agency expertise, another goal,[13] is not a compelling factor if the agency's decision maker is a person in the same position as the fired employee, with less experience. Nor is legislative choice [14] persuasive, when the statute does not explicitly address whether Section 11–113 applies when a head of a principal unit is terminated. A fourth goal, "prevent[ing] the courts from interfering with the administrative process until it has run its course," [15] is not a persuasive reason when the "administrative process" necessarily involves a conflict of interest.

Finally, I find it telling that no one sent Forster a notice advising her that she must appeal to the new Public Defender or Acting Public Defender. Likely, neither the Board of Directors nor anyone in leadership at the agency interpreted the statute the way the Majority does. In short, enforcing administrative exhaustion in this case simply creates more "gotcha jurisprudence" of the kind I objected to in *Hansen v.*

---

**13.** *See* Rochvarg, § 14.9; *Adamson v. Corr. Med. Servs.*, 359 Md. 238, 271, 753 A.2d 501, 518–19 (2000) (explaining that agency expertise, although it is a goal of administrative exhaustion, does not always support requiring exhaustion).

**14.** *See* Rochvarg, § 14.9; *Wilson*, 389 Md. at 89, 882 A.2d at 885–86 (legislative intent supports administrative exhaustion).

**15.** *See* Matthew Bender, *Administrative Law* (2011), § 43.02[3]; *Arroyo v. Bd. of Educ.*, 381 Md. 646, 658, 851 A.2d 576, 583–84 (2004) ("[J]udicial interference is withheld until the administrative process has run its course." (citations and quotation marks omitted)).

*City of Laurel,* 420 Md. 670, 697–98, 25 A.3d 122, 139 (2011) (Adkins, J., dissenting), and *Smith v. County Comm'rs,* 418 Md. 692, 720, 18 A.3d 16, 32–33 (2011) (Adkins, J., dissenting). I respectfully dissent from the Majority's resting its decision on exhaustion grounds.

Yet I concur with the Majority's decision that Forster does not prevail in her appeal. Rather than holding that she failed to exhaust her administrative remedies, I would rest our decision on Forster's failure to state a claim of wrongful discharge.

### Failure to State a Claim

The Circuit Court granted the State's motion to dismiss, holding that Forster's complaint failed to state a claim of wrongful discharge because none of the Board's demands violated the law or public policy. The court reasoned that Forster's primary legal duty, providing representation to indigent individuals, was not contravened by any of the Board's instructions. Thus, it held that the complaint simply evidenced

> a disagreement . . . about how best to accomplish the important work of the Office of Public Defender. . . . Such differences of opinion, between an executive and members of a board to which the executive answers, without allegations of actual statutory breaches, are too general, too vague, too conclusory as to constitute a prima facie claim of wrongful discharge.

In reviewing a motion to dismiss, this Court views the factual allegations in the complaint in the light most favorable to the plaintiff, but reviews whether the trial court's conclusions of law were "legally correct." *RRC Ne., LLC v. BAA Md., Inc.,* 413 Md. 638, 643–44, 994 A.2d 430, 433–34 (2010). As we said in *Parks v. Alpharma:*

> On appeal from a dismissal for failure to state a claim, we must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences

that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.,* the allegations do not state a cause of action for which relief may be granted. We must confine our review ... to the four corners of the complaint and its incorporated supporting exhibits, if any. The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice. Our goal, in reviewing the trial court's grant of dismissal, is to determine whether the court was legally correct. (Citations and quotation marks omitted.)

*Parks v. Alpharma, Inc.,* 421 Md. 59, 72, 25 A.3d 200, 207 (2011).

Generally, an at-will employee may be terminated for any reason or no reason, but there are certain exceptions to this rule. *See id.* at 73–74, 25 A.3d at 208. Terminating an employee because of her "race, color, religion, sex, age, national origin, marital status, or physical or mental handicap" is one exception. *Id.* Another exception is when the termination violates a clear mandate of public policy, which triggers a cause of action for wrongful discharge. *Id.* at 74–75, 25 A.3d at 208–09. If the termination does not contravene a clear mandate of public policy, however, no cause of action for wrongful discharge is stated. *Id.; see also Porterfield v. Mascari II, Inc.,* 374 Md. 402, 434, 823 A.2d 590, 609 (2003) ("[T]here is no sufficiently clear mandate of public policy that has been violated on the facts alleged here such that vindication by bringing a wrongful discharge action is required to protect the public interest."); *Adler v. Am. Standard Corp.,* 291 Md. 31, 45–46, 432 A.2d 464, 472 (1981) ("The bald allegations of Adler's complaint do not provide a sufficient factual predicate for determining whether any declared mandate of public policy was violated.... The allegations are therefore legally insufficient to state a cause of action for wrongful discharge."), *superseded by statute on other grounds,* Chapter 223 of the Acts of 1993, *as recognized in Wholey v.*

*Sears, Roebuck & Co.,* 370 Md. 38, 68–69, 803 A.2d 482, 500 (2002).

Forster alleges that the Board's decision to terminate her contravened the public policy outlined in the Title 16 of the Criminal Procedure Article,[16] which governs the Office of the Public Defender. Specifically, Forster contends that her termination violated the policies outlined in Section 16–201, which provides:

It is the policy of the State to:

(1) provide for the realization of the constitutional guarantees of counsel in the representation of indigent individuals, including related necessary services and facilities, in criminal and juvenile proceedings in the State;

(2) assure the effective assistance and continuity of counsel to indigent accused individuals taken into custody and indigent individuals in criminal and juvenile proceedings before the courts of the State; and

(3) authorize the Office of the Public Defender to administer and assure enforcement of this title.

Forster alleges that her termination violated these public policies in three ways. First, she argues the Board made demands that would have prevented her from carrying out the statutorily mandated mission of the Office. Because failing to carry out the Office's mission would have been "unlawful," she says, she was terminated for "refus[ing] to engage in unlawful activity as ordered by the Board[.]" Second, she says, carrying out the Office's mission was her statutory duty, which means that she was also terminated for "exercis[ing] her statutorily prescribed duties as the Maryland Public Defender." Finally, she alleges that her termination violated the public policy stated in Section 16–302, which lists the duties of the Board,[17] because her termination was premised on her

---

16. Unless otherwise indicated, all statutory references below are to the Criminal Procedure Article.

17. Section 16–302 provides that the Board shall:
 (1) study and observe the operation of the Office;

failure to comply with demands that the Board had no authority to make.[18]

The State responds that nothing in the complaint shows that Forster's termination contravened a clear mandate of public policy. Rather, the State asserts that Forster's allegations, and any reasonable inferences drawn from them, at most show that Forster was fired because of the Board's "dissatisfaction with her job performance," particularly its "view that she was engaging in fiscal mismanagement to the detriment of the mission of the [O]ffice and the administration of justice[.]"

### The Public Policy Against Unlawful Acts

After reviewing the cases that address the public policy against requiring an employee to commit unlawful acts, it is apparent Forster's allegations do not fit the classic mold. As we said in *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 610, 561 A.2d 179, 182 (1989), this public policy is most often implicated when an employee is fired for refusing to give false testimony. It has also been implicated when an employee refused to provide sexual favors amounting to prostitution,[19] commit fraud by submitting false claims for health insurance,[20] or commit torts and violate others' privacy rights.[21]

---

(2) coordinate the activities of the regional advisory boards; and
(3) advise the Public Defender on panels of attorneys, fees, and other matters about the operation of the public defender system.

**18.** Forster also argues that the trial court erred by performing a "legal interpretation of [her] allegations instead of accepting her allegations as true." Yet a trial court must always perform legal analysis to determine if the facts in the complaint, plus all reasonable inferences drawn from them, are legally sufficient to constitute the wrong alleged. *See, e.g., Parks v. Alpharma, Inc.*, 421 Md. 59, 72, 25 A.3d 200, 207 (2011) ("Our goal, in reviewing the trial court's grant of dismissal, is to determine whether the court was legally correct.").

**19.** *See Insignia Residential Corp. v. Ashton*, 359 Md. 560, 573, 755 A.2d 1080, 1087 (2000).

**20.** *See Magee v. DanSources Tech. Servs., Inc.*, 137 Md.App. 527, 572–73, 769 A.2d 231, 257–58 (2001).

**21.** *See Kessler v. Equity Mgmt., Inc.*, 82 Md.App. 577, 589, 572 A.2d 1144, 1150 (1990).

Here, on the other hand, the alleged "unlawful activity" is better characterized as managerial decisions that Forster believed would not have best accomplished the mission of the Office. For example, Forster claims that it would have been "unlawful" for her to begin using panel attorneys in CINA proceedings,[22] because Section 16–204(b)(1) requires the public defender to provide representation. Yet Section 16–204(a) specifically provides that the representation mandated by subsection (b) may be provided by panel attorneys. *See* Section 16–204(a). Indeed, Section 16–208(b)(2) provides that panel attorneys "shall be used as much as practicable." Using panel attorneys, therefore, clearly was not unlawful.

The same is true of Forster's allegation that

the Board's demands that she disband the Capital Defense Division, the Juvenile Protection Division and close the Northwest Community Defenders would have forced her to violate the Public Defender Statute, requiring [the Office] to provide representation in "a criminal or juvenile proceeding in which a defendant or party is alleged to have committed a serious offense," § 16–204(b)(1)(i), and "in all stages of a proceeding," § 16–204(b)(2).

As the State points out, it is not reasonable to infer, from the facts alleged in the complaint, that the Board intended to prevent the Office from representing indigent defendants. Instead, I agree with the State that the Board's demands were simply a "request[ ] that she reorganize the Office by merging programs and that she utilize more panel attorneys in order to maximize resources." This is not unlawful activity.[23]

---

**22.** Child in Need of Assistance proceedings under Maryland Code (1973, 2006 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article. *See Cosby v. Dep't of Human Res.*, 425 Md. 629, 42 A.3d 596 (2012).

**23.** Nor was it made unlawful by Forster's bald allegation that the Board's directives would have resulted in ineffective assistance of counsel, as that question cannot be determined until each case occurs. Indeed, Forster's allegation about ineffective assistance of counsel demonstrates even more strongly that what her complaint really alleges is

The serious budget shortfall underlying this case must inform any reasonable inference drawn from Forster's allegations. The complaint reveals that, as early as 2008, Forster wrote to Chief Judge Bell regarding the "severe budget shortfalls" affecting the Office. In 2010, she "requested an emergency meeting with the Governor regarding [the Office's] desperate budget situation." The complaint also references a hiring freeze instituted by the Governor.

Forster claims that her mandate to operate within the budget and follow the hiring freeze would have been violated if she had complied with the Board's demands to empanel more attorneys and rehire law clerks. Yet it is obvious that the Board was not demanding that Forster violate her mandate to operate within the budget or contravene the Governor. On the contrary, in the context of the "desperate budget situation," the only reasonable inference is that the Board believed its changes were part of a necessary response to the budget crisis, to ensure that the Office continued to fulfill its mission while also operating within its squeezed budget. It would be unreasonable to interpret the facts, as alleged in the complaint, as showing that the Board instructed Forster to violate the law by overspending.

Forster comes close to alleging a violation of law when she posits that the Board instructed her to violate the rights of merit system employees by demoting them without basis. The complaint does not specify, however, which of the Board's demands would have required her to do this, or indeed which law would have been violated. The complaint simply makes a general, conclusory statement that the Board's demands would have "violated the rights of merit-system state employees" and the "constitutional rights of [Office] employees[.]" I think this statement is "too general, too conclusory, too vague and lacking in specifics to mount up to a prima facie showing that the claimed misconduct ... violated the public policy of this state." *Adler*, 291 Md. at 44, 432 A.2d at 471. Rather, in the

---

her belief that the Board's directives were not the best course of action for the Office, not that any clear mandate of public policy was violated.

context of the ongoing dispute regarding how to deal with the budget crisis, the Board's demands look less like a mandate to break the law and more like an honest attempt to ensure that the Office would continue to fulfill its mission.

## Statutory Duties

In addition to arguing that the Board's demands would have required her to commit unlawful acts, Forster argues that those same demands interfered with her statutory duties as Public Defender, and thus implicated the public policy against firing employees for exercising a specific legal right or duty. *See, e.g., Makovi,* 316 Md. at 611, 561 A.2d at 183. As with the public policy against illegal acts, however, reviewing the cases that have implicated this public policy suggests that Forster's claim does not fit.

To begin with, this public policy is typically implicated when an employee exercises a personal right or privilege, not a legal duty. *See* Stanley Mazaroff & Todd Horn, *Maryland Employment Law* (2d ed.2011), § 5.01[2][c] (observing that "[m]ost of the reported wrongful discharge cases in Maryland fit within" the "category of cases . . . involv[ing] the discharge of an employee for exercising a legal right or privilege"); *see also Watson v. Peoples Sec. Life Ins. Co.,* 322 Md. 467, 469, 588 A.2d 760, 760–61 (1991) (employee fired for suing a co-worker for sexual harassment and assault and battery); *Ewing v. Koppers Co.,* 312 Md. 45, 50, 537 A.2d 1173, 1175 (1988) (employee fired for filing a workers' compensation claim). Forster does not allege that she was fired for exercising any statutory right or privilege.

Moreover, when a wrongful discharge involves the exercise of a statutory duty, instead of a right or privilege, it is typically the duty to report the illegal activity of others in the organization. *See* Mazaroff & Horn, § 5.01[2][b] (referring to the "public interest in protecting employees from retaliatory discharge when they inform law enforcement officials of suspected criminal behavior by their employer or its managers"); *Makovi,* 316 Md. at 611, 561 A.2d at 183 (1989) ("Illustrating the . . . category [of] cases where the employee was fired for

performing an important public obligation, are *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (employee fired for insisting that employer comply with state and federal product labeling and licensing law); *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981) (employee discharged for reporting the suspected criminal activity of co-employee to law enforcement authorities); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (en banc) (employee fired for serving jury duty)."); *Bleich v. Florence Crittenton Servs. of Balt., Inc.*, 98 Md.App. 123, 135–36, 632 A.2d 463, 469 (1993) (employee punished for fulfilling the duty to report child abuse or neglect).

Here, the facts are nothing like the above cases. Forster cites the same Board directives that she claimed were demands to break the law, now alleging that they were demands to stop exercising her statutory duties. She claims that she was fired for "refusing to implement operational and personnel changes demanded of her ... that were contrary to [her] duties and obligations as the Public Defender." Yet the Board's instructions, for the same reasons they did not require her to break the law, clearly did not require her to refrain from exercising her statutory duties. Rather, the Board's instructions simply represented its opinion regarding how best to fulfill those duties in a cash-strapped situation.

At the heart of this case is Forster's belief that the Board—because Section 16–302 provides that it shall "study," "observe," "coordinate," and "advise" the Office—could not make specific demands of her and then fire her for failing to comply with those demands. To be sure, the history and structure of the statutory scheme, as Forster well explains, suggests that the Legislature did not intend for the Board to manage the operations of the Office. That job was given to the Public Defender, the head of the principal unit. *See* Section 16–207; Maryland Code (1994, 2009), § 6–404(a)(1) of the State Personnel and Pensions Article.

The problem with Forster's argument, however, is that it proves too much, as she provides no limiting principle on her

discretion over the Office's operations. Under her interpretation, she is free to manage and direct the Office with complete impunity, subject to no check on her power to interpret and implement the Office's statutory directives. Yet the Legislature created an important check on her power when it invested the Board with the ability to fire her. As the Ninth Circuit has explained, it is a well-recognized principle of administrative law that the power to terminate necessarily implies some modicum of control:

> The power to remove is the power to control. The truth of this statement was recognized by the Supreme Court in *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). "For it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 629 [55 S.Ct. 869]. In *Bowsher* the Court maintained that the removal power need not be exercised to exert effective control, the mere existence of removal authority is likely to influence behavior. 478 U.S. at 727 n. 5 [106 S.Ct. 3181]. "In Constitutional terms, the removal powers over the Comptroller General's office dictate that he will be subservient to Congress." *Id.* at 730 [106 S.Ct. 3181].

*Silver v. U.S. Postal Serv.,* 951 F.2d 1033, 1039 (9th Cir.1991) (quoting *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Humphrey's Ex'r v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)); *see also Schisler v. State,* 394 Md. 519, 590, 907 A.2d 175, 183 (2006) ("By placing the responsibility for execution of the ... Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act[.]" (quoting *Bowsher,* 478 U.S. at 733–34, 106 S.Ct. at 3191–92)); *City of Balt. Dev. Corp. v. Carmel Realty Assocs.,* 395 Md. 299, 326, 910 A.2d 406, 422 (2006) ("[T]hrough the nomination, removal, and appointment process, the Mayor controls the City of Baltimore Development Corporation.").

It is not necessary, in reviewing this dismissal, to determine exactly how the Legislature intended to apportion the division

of labor between the Public Defender and the Board. Suffice it to say that Forster cannot be right in her claim that any "interfere[nce] with her performance of statutory duties" by the Board constitutes an *ultra vires* act that she has a duty to ignore. This is because, in light of the Board's ability to terminate her at will, her duty must include, to some extent, working out agreements with the Board. As in *Bowsher,* "the [Board's] removal powers over the [Public Defender] dictate that [s]he will be subservient to [the Board]." 478 U.S. at 730, 106 S.Ct. at 3190.[24]

## Conclusion

Because I believe that Forster's claim should not have been dismissed under exhaustion principles, I would decide this case on the grounds used by the trial court, *i.e.,* that the complaint does not state a cause of action for wrongful discharge. Although this Court, in the context of a motion to dismiss, is required to assume the truth of the facts alleged in the complaint, and draw all reasonable inferences in favor of the nonmoving party, even the most generous inferences do not suggest that Forster's termination violated a clear mandate of public policy. There is simply nothing to suggest that the Board fired her for refusing to break the law or for exercising her duties as Public Defender. Rather, her termination was simply the culmination of a long-running disagreement with the Board about how best to deal with the financial crisis plaguing the Office. Because Forster's termination did

---

**24.** This conclusion is not disturbed by the only three cases Forster cites on this point, which are inapposite. *See Peters v. Hobby,* 349 U.S. 331, 345–46, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955) (discussing a review board that had no power to make an initial determination to fire an employee); *Balt. Transit Co. v. Flynn,* 50 F.Supp. 382, 386, 389 (D.Md. 1943) (dismissing a complaint for injunctive relief against an order of the National War Labor Board that had ordered a company to reinstate an employee, because the complaint did not state a claim upon which relief could be granted, and observing in dicta that courts should keep in mind the distinction between the Board's power to "take over" an industry and its lack of power to control the industry "by indirect control ... of internal management"); *Wadman v. City of Omaha,* 231 Neb. 819, 438 N.W.2d 749, 755 (1989) (defining "insubordination" under Nebraska law).

not violate a mandate of public policy, it does not state a cause of action for wrongful discharge, and should be dismissed. For this reason, I concur with the Majority's judgment.

Judge BATTAGLIA has authorized me to state that she joins in this concurring and dissenting opinion.